Roy Herrera (#032901)
Daniel A. Arellano (#032304)
**HERRERA ARELLANO LLP**
1001 North Central Avenue, Suite 404
Phoenix, Arizona 85004
Telephone: 602.567.4820
roy@ha-firm.com
daniel@ha-firm.com

Alexis E. Danneman (#030478)
**PERKINS COIE LLP**
2525 East Camelback Road, Suite 500
Phoenix, Arizona 85016-4227
Telephone: 602.351.8000
ADanneman@perkinscoie.com
DocketPHX@perkinscoie.com

Jonathan P. Hawley (WA #56297)*
Heath L. Hyatt (WA #54141)*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: 206.359.8000
JHawley@perkinscoie.com
HHyatt@perkinscoie.com

*Attorneys for the Democratic National Committee*

*Motion for admission pro hac vice forthcoming*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| STRONG COMMUNITIES FOUNDATION OF ARIZONA INCORPORATED et al., <br><br> Plaintiffs, <br><br> v. <br><br> STEPHEN RICHER, in his official capacity as Maricopa County Recorder, et al., <br><br> Defendants. | No. CV-24-02030-PHX-SMB <br><br> **DEMOCRATIC NATIONAL COMMITTEE'S [PROPOSED] MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

1

# TABLE OF CONTENTS

2    INTRODUCTION .................................................................................................. 1

3    LEGAL STANDARDS ......................................................................................... 1

4    ARGUMENT ......................................................................................................... 2

5      I.    Plaintiffs cannot rely on the widely rejected vote-dilution theory of standing. ................................................................................. 2

6

7      II.    Plaintiffs' claims fail as a matter of law. ...................................... 3

8          A.    Plaintiffs' state claims are based on misinterpretations of Arizona law. ................................................................. 3

9          B.    Plaintiffs' federal claim is based on a misinterpretation of the NVRA. ......................................................................... 7

10

11      III.    Plaintiffs' request for immediate relief is barred as a matter of law. ......... 8

12          A.    Under the NVRA, Arizona cannot undertake systematic efforts to remove voters from the rolls this close to an election. ......................................................................... 9

13

14          B.    This Court cannot grant Plaintiffs' requested relief consistent with the Eleventh and Fourteenth Amendments. ........................... 11

15      IV.    Plaintiffs are not otherwise entitled to preliminary relief. ........................ 12

16          A.    Plaintiffs cannot succeed on the merits. .......................................... 13

17          B.    The equities foreclose immediate relief. .......................................... 13

18              1.    The *Purcell* doctrine forecloses late-hour, disruptive changes to election rules. .................................................... 13

19

20              2.    Plaintiffs have not established any risk of imminent injury. ................................................................... 16

21              3.    Neither the balance of harms nor public interest supports Plaintiffs' request. .................................................. 17

22    CONCLUSION ................................................................................................... 17

23    CERTIFICATE OF SERVICE ........................................................................... 19

24

25

26

### INTRODUCTION

Plaintiffs seek disruptive, eleventh-hour relief that is foreclosed by caselaw, federal statute, basic principles of equity, and at least two amendments to the U.S. Constitution. Their claims cannot succeed on the merits, as they fundamentally misunderstand what state and federal law require in the verification of voter eligibility and the protection against noncitizen voting. And they ignore that, while federal law prohibits systematic voter-removal programs of the sort Plaintiffs seek to initiate, it allows individualized deregistration of a voter who is confirmed to be a noncitizen—if, indeed, Plaintiffs produce any actual proof that noncitizens are on Arizona's voter rolls.

Because neither the law nor the equities support Plaintiffs' request for the extraordinary remedy of immediate relief, their motion for a temporary restraining order and preliminary injunction should be denied. And, because their causes of action fail as a matter of law, their amended complaint should be dismissed with prejudice.

### LEGAL STANDARDS

A plaintiff's lack of standing can be challenged in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). *Meland v. Weber*, 2 F.4th 838, 843 (9th Cir. 2021). "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof[.]" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Additionally, dismissal under Rule 12(b)(6) is "proper [] where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (cleaned up).

 "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

**ARGUMENT**

**I.     Plaintiffs cannot rely on the widely rejected vote-dilution theory of standing.**

"To establish standing, . . . a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

Here, to satisfy Article III, Plaintiffs claim an injury that, in recent years, has been widely scrutinized—and universally rejected—by courts: vote dilution. *See* Pls.' Mot. for TRO & Prelim. Inj. ("Mot.") 16, ECF No. 16 ("[E]very vote cast by a foreign citizen dilutes the votes of eligible voters."). As one federal court has observed, "[d]istrict courts across the country have consistently dismissed complaints premised on the theory of unconstitutional vote dilution." *Soudelier v. Dep't of State*, Civ. No. 22-2436, 2022 WL 17283008, at *3 (E.D. La. Nov. 29, 2022) (citing cases), *aff'd*, No. 22-30809, 2023 WL 7870601 (5th Cir. Nov. 15, 2023); *see also, e.g., Bowyer v. Ducey*, 506 F. Supp. 3d 699, 711–12 (D. Ariz. 2020) (similar). This near unanimity is no surprise given the U.S. Supreme Court's repeated admonition that a voter's claim "that the law . . . has not been followed" is "precisely the kind of undifferentiated, generalized grievance about the conduct of government" insufficient for standing. *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam). Simply put, Plaintiffs' vote-dilution theory of standing is a nonstarter.

Ms. Cahill's other purported basis for standing is plainly insufficient as well. She proposes some form of equal-protection injury, suggesting that, "as a naturalized citizen with an alien number, she is subject to citizenship verifications through SAVE," whereas "registered voters who are natural-born citizens or who are unlawfully present foreign citizens lacking an alien number are not." Mot. 16. But Plaintiffs do not and cannot explain how this purportedly differential treatment actually *injures* Ms. Cahill. For purposes of standing, "[a]n injury in fact must be 'concrete,' meaning that it must be real and not

abstract. The injury also must be particularized; the injury must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." *All. for Hippocratic Med.*, 602 U.S. at 381 (citation omitted) (quoting *Lujan*, 504 U.S. at 560 n.1). Ms. Cahill's alleged injury is anything but personal and individual; she fails to identify how differing levels of citizenship scrutiny impose concrete harm on *her* (for example, by making it harder for her to register or cast a ballot). Indeed, her reliance on the uniformity and nondiscrimination requirement of the National Voter Registration Act ("NVRA"), 52 U.S.C. §§ 20501–20511, *see* Mot. 16, confirms that her standing injury is nothing more than a generalized "grievance about government—claiming only harm to [her] and every citizen's interest in proper application of the Constitution and laws"—which does not satisfy Article III, *Lance*, 549 U.S. at 439 (quoting *Lujan*, 504 U.S. at 573–74).

Because Ms. Cahill does not have standing, she cannot seek preliminary relief, *see Lopez v. Candaele*, 630 F.3d 775, 794 (9th Cir. 2010), and should be dismissed from this lawsuit, *see, e.g.*, *Stephen C. ex rel. Frank C. v. Bureau of Indian Educ.*, No. CV-17-08004-PCT-SPL, 2018 WL 1871457, at *2–3 (D. Ariz. Mar. 29, 2018).[1]

## II.    Plaintiffs' claims fail as a matter of law.

Plaintiffs' five causes of action are premised on fundamental and fatal misunderstandings of Arizona law, federal law, or both. Because they have failed to state claims on which relief can be granted, dismissal of their amended complaint is required.

### A.    Plaintiffs' state claims are based on misinterpretations of Arizona law.

Plaintiffs bring four claims under state law. The first three allege that, because Defendants *can* send citizenship-check requests to the U.S. Department of Homeland

---

[1] Additionally, given that EZAZ.org claims "representational standing on behalf of its members on the same essential grounds as Ms. Cahill," Mot. 17, and she in turn does *not* have standing, representational standing is not available to EZAZ.org, since it is a sine qua non of the doctrine that an organization's "members would otherwise have standing to sue *in their own right*." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (emphasis added).

Security ("DHS") pursuant to 8 U.S.C. §§ 1373 and 1644, Arizona law *requires* that they do so. The fourth alleges that Defendants failed to "make available" a list of all federal-only voters to the Arizona Attorney General on or before October 31, 2022. *See* A.R.S. § 16-143. None of the four claims has merit: The first three are unsupported by the law, and the fourth is disproved by Plaintiffs' own filings.

**A.R.S. § 16-121.01(D).** Plaintiffs' first two claims are premised on the assertion that A.R.S. § 16-121.01(D) obligates Defendants to verify the citizenship of new federal-only voters through DHS's Person Centric Query Service (the "PCQS"). *See* First Amended Complaint ("FAC") ¶¶ 164–76, ECF No. 12. Plaintiffs, however, interpret the statutory requirements too broadly.

*First*, section 16-121.01(D) requires that, "[w]ithin ten days after receiving an application for registration," county recorders "use all available resources to verify the citizenship status of the applicant." Plaintiffs argue that a "1373/1644 Request" through the PCQS "is an 'available' resource." *Id.* ¶ 166. But Plaintiffs' expansive interpretation of "all available resources," which would mandate that county recorders consult a theoretically endless universe of resources—not only the PCQS but, by Plaintiffs' logic, *every* government database, private social-media accounts, and even applicants' friends and families—would lead to absurd results. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."). Moreover, "[a]n excerpted clause in a statute cannot be interpreted without reference to the statute as a whole." *Westwood Apex v. Contreras*, 644 F.3d 799, 804 (9th Cir. 2011). Here, the statute provides further guidance: that recorders "*at a minimum* shall compare the information available on the application for registration with" an enumerated list of databases. A.R.S. § 16-121.01(D) (emphasis added). By its plain language, the "minimum" is what the law *requires*; if it required more than that, then the "minimum"

1   would be surplusage. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112

2   (1991) ("[W]e construe statutes, where possible, so as to avoid rendering superfluous any

3   parts thereof."). Finally, the statute qualifies the databases to be consulted as those to

4   which "*the county has access*." A.R.S. § 16-121.01(D) (emphasis added). This qualifier

5   makes sense: The statute requires citizenship verification "[w]ithin ten days after receiving

6   an application for registration," a tight turnaround that might not be feasible if county

7   recorders had to rely on other government entities. By Plaintiffs' own description,

8   however, Defendants do *not* have access to the PCQS; the system instead requires that

9   requests be submitted through DHS. *See, e.g.*, FAC ¶¶ 127–28 ("*DHS* has the capability

10  to verify an individual's citizenship status . . . . DHS maintains the [PCQS] database that

11  allows *agency employees* to look up individuals[.]" (emphases added)). As such, *DHS* has

12  access to the PCQS—not Arizona's county recorders.

13       In short, the statute cannot be read to require Defendants to go to impossible lengths

14  to verify citizenship—let alone in the "ten days" required for them to take action. A.R.S.

15  § 16-121.01(D). If Plaintiffs want to increase county recorders' minimum citizenship-

16  verification obligations, then the proper recourse is the legislative process, not a lawsuit.

17       *Second*, Plaintiffs rely on the statute's catchall provision, *see id.* § 16-121.01(D)(5),

18  to conclude that Defendants must submit federal-only voters to additional DHS databases,

19  *see* FAC ¶ 165. But subsection (5) requires only that election officials consult "[a]ny other

20  state, city, town, county or federal database and any other database *relating to voter*

21  *registration* to which the county recorder or officer in charge of elections has access."

22  A.R.S. § 16-121.01(D)(5) (emphasis added). The PCQS, by contrast, is *not* "relat[ed] to

23  voter registration." As a DHS report linked in Plaintiffs' amended complaint explains, the

24  PCQS "allow[s] DHS employees and certain external federal agency employees, such as

25  Department of State [] Consular Officers, to obtain a consolidated read only view of an

26  immigrant's past interactions with the U.S. Government as he or she passed through the

1   U.S. immigration system." *Privacy Impact Assessment Update for the Person Centric*

2   *Query Service*, DHS 1 (Apr. 6, 2018), https://www.dhs.gov/sites/default/files/

3   publications/privacy-pia-uscis-pcqsupdate-april2018.pdf. Because the PCQS has nothing

4   to do with voter registration, Defendants are not required to utilize it (or any other new

5   database Plaintiffs point to) under A.R.S. § 16-121.01(D).[2]

6      **A.R.S. § 16-165(K).** Plaintiffs' attempt to subject existing voters to additional

7   scrutiny, *see* FAC ¶¶ 177–86, also fails. The statute they cite requires only that county

8   recorders review databases to "*confirm* information obtained that requires cancellation of

9   registrations," A.R.S. § 16-165(K) (emphasis added); it does not authorize, much less

10  require, that Defendants use federal databases to *initiate* citizenship investigations.

11  Moreover, the statute limits what must be confirmed to information that would *require*

12  cancellation. Contrary to Plaintiffs' repeated assertions, declining to provide documentary

13  proof of citizenship ("DPOC") would not require cancellation of a registration. To the

14  contrary, courts have repeatedly reaffirmed that Arizonans can be registered as federal-

15  only voters if they register without providing DPOC. *See, e.g.*, *Mi Familia Vota v. Fontes*,

16  111 F.4th 976, 984–85 (9th Cir. 2024) (per curiam). Put differently, the only conclusive

17  information to be gleaned from the fact that a voter did not provide DPOC is that *the voter*

18  *did not provide DPOC*. Nothing else can be inferred—especially not that a registration

19  "requires cancellation," which is the plain limit of A.R.S. § 16-165(K).

20     **A.R.S. § 16-143(A).** Plaintiffs' fourth claim, which alleges that Defendants have

21  failed to submit required information to the Attorney General, *see* FAC ¶¶ 187–90, is

22  disproved by Plaintiffs' own filings. Their motion for preliminary relief includes a letter

23  sent to them by the Pima County Recorder on July 26, 2024, informing them that "the 15

24

25     [2] The DHS report further indicates that the PCQS is not actually a "database," as
   A.R.S. § 16-121.01(D)(5) specifies. Instead, it merely displays "a consolidated read-only
26  view" of information contained in *other* federal systems, data sets, and databases. *Privacy*
   *Impact Assessment Update*, *supra*, at 1 & n.1

1   recorders in the state of Arizona agreed in 2022 that the report [in question] would come

2   from the Secretary of State. In October 2022, the Secretary of State sent the Attorney

3   General a list of all Federal Only voters . . . . The Attorney General found no non-citizen

4   voters registered." Mot. Ex. G, at 1. This letter demonstrates that Defendants did what

5   they were supposed to do: "make available to the attorney general a list of all individuals

6   who are registered to vote and who have not provided satisfactory evidence of

7   citizenship." A.R.S. § 16-143(A). Because nothing in A.R.S. § 16-143(A) prohibits the

8   county recorders and Secretary of State from collaborating on the required list, Defendants

9   have complied with the statute, and Plaintiffs' fourth claim fails.

10   **B.     Plaintiffs' federal claim is based on a misinterpretation of the NVRA.**

11   Plaintiffs' NVRA claim proceeds as follows: Because (1) Arizona law requires

12   Defendants to verify the citizenship status of federal-only voters using, among other

13   resources, the SAVE system, *see* A.R.S. § 16-121.01(D)(3), and (2) SAVE requires an

14   alien number or other numeric identifier, which not all federal-only voters have or might

15   provide, this practice is not "uniform" and "nondiscriminatory," 52 U.S.C. § 20507(b)(1),

16   since only *some* federal-only voters will be subjected to SAVE verification, *see* FAC

17   ¶¶ 191–99; Mot. 19–21. Neither this claim nor Plaintiffs' requested relief can succeed.

18   To begin, Arizona's use of the SAVE system is neither discriminatory nor

19   nonuniform as those terms are used in the NVRA. As the court explained in *Mi Familia*

20   *Vota v. Fontes*, a practice "does not violate . . . the NVRA [where] the 'trigger' for county

21   recorders to investigate the citizenship status of applicants is uniform and

22   nondiscriminatory." No. CV-22-00509-PHX-SRB, 2024 WL 862406, at *42 (D. Ariz.

23   Feb. 29, 2024) (quoting *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 776 (2018)),

24   *appeal docketed*, No. 24-3188 (9th Cir. May 17, 2024). There, the uniform,

25   nondiscriminatory trigger at issue was a "voter [] not submit[ting] DPOC proving her

26   citizenship," *id.*; here, the trigger is a federal-only voter providing a SAVE-compliant

numeric indicator (since the Arizona statute only requires SAVE verification "if practicable"), A.R.S. § 16-121.01(D)(3). The *Mi Familia Vota* court contrasted the NVRA-compliant practice with a separate trigger that *did* violate the uniformity and nondiscrimination provision: a list-maintenance procedure that required county recorders to "only [] conduct SAVE checks on naturalized citizens who county recorders have 'reason to believe' are non-citizens," which the court found unlawfully discriminatory because "[n]aturalized citizens will always be at risk of county recorders' subjective decision to further investigate these voters' citizenship status." 2024 WL 862406, at *38, *41. Absent a similarly subjective and discriminatory trigger, the SAVE verification procedure does not violate the NVRA.

Moreover—and revealingly—Plaintiffs' proposed remedy for the alleged NVRA violation is *not* to enjoin the unlawful practice, but instead to ratchet up the burden by subjecting *all* federal-only voters to DHS scrutiny. *See* FAC ¶¶ 194–96; Mot. 20. Plaintiffs casually seek to turn basic principles of jurisprudence and federalism on their head, since "an injunction preventing [] enforcement" of an unlawful statute "is the traditional remedy for proven violations of legal rights likely to work irreparable injury in the future." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 652 (2020) (Gorsuch, J., concurring in the judgment in part and dissenting in part). Plaintiffs instead call on the Court to legislate from the bench and enact new list-maintenance obligations for Arizona's county recorders and new burdens for federal-only voters—something this Court cannot and should not do. *See Califano v. Westcott*, 443 U.S. 76, 92 (1979) (proposed remedy that would cure discriminatory practice by disadvantaging additional individuals "would involve a restructuring of the [law] that a court should not undertake lightly").

**III.    Plaintiffs' request for immediate relief is barred as a matter of law.**

Even setting aside the legal shortcomings of Plaintiffs' claims, the relief they seek through their pending motion is foreclosed by federal law and the U.S. Constitution.

**A.    Under the NVRA, Arizona cannot undertake systematic efforts to remove voters from the rolls this close to an election.**

Plaintiffs ask the Court to order a "systematic cancellation of registrations within 90 days of an election," which is plainly prohibited by Section 8 of the NVRA. *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1092–93 (D. Ariz. 2023); *see also* 52 U.S.C. § 20507(c)(2)(A). Because Plaintiffs' motion follows more than a month after the ninety-day cutoff before the November election, the voter-removal relief they seek—"submitting a list of their Federal-Only Voters to [DHS] to verify the citizenship and immigration status of these registrants," Mot. 2—cannot be granted.

Plaintiffs have suggested that this relief does not violate the NVRA because it is not "any kind of automated purge of voter registrations." Pls.' Opp'n to Mot. to Intervene of Voto Latino & One Arizona 4, ECF No. 11. But caselaw from this and other courts confirms that Plaintiffs read Section 8 too narrowly. It is not only automated purges that are prohibited after the ninety-day cutoff, but "*any* program" that "*systematically remove[s]*" voters from the rolls. 52 U.S.C. § 20507(c)(2)(A) (emphases added). "[T]he phrase 'any program' suggests that the 90 Day Provision has a broad meaning. Read naturally, the word 'any' has an expansive meaning, that is 'one or some indiscriminately of whatever kind.'" *Mi Familia Vota*, 691 F. Supp. 3d at 1093 (cleaned up) (quoting *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014)). As the Eleventh Circuit has concluded, Section 8 applies even to the "use[ of] a mass computerized data-matching process to compare the voter rolls with other state and federal databases, followed by the mailing of notices," *Arcia*, 772 F.3d at 1344—precisely what Plaintiffs seek here.

It is, in other words, irrelevant that the program Plaintiffs seek would not automatically remove voters and would instead require additional, individualized follow-up inquiry; that was also the case in *Arcia*, and the court emphasized that a "program [that] did not rely upon individualized information or investigation to determine which names

1   from the voter registry to remove" and instead "used a mass computerized data-matching

2   process" was an impermissibly "systematic" program for NVRA purposes. *Id.*

3         Nor does it matter that Plaintiffs seek only to remove supposedly ineligible voters

4   from the rolls. To prevent "selective purging of the voter rolls," S. Rep. No. 103-6, at 3

5   (1993), and because "[e]ligible voters removed days or weeks before Election Day will

6   likely not be able to correct the State's errors in time to vote," *Arcia*, 772 F.3d at 1346,

7   the NVRA's cutoff is broadly designed to prohibit *any* systematic removal programs

8   ahead of an election, even those with ostensibly defensible aims, *see id.* at 1345

9   ("Noticeably absent from the list of exceptions to the 90 Day Provision is any exception

10  for removal of non-citizens."); *Mi Familia Vota*, 691 F. Supp. 3d at 1093 (rejecting

11  argument that "the 90-day Provision does not apply to removing noncitizens who were

12  not properly registered in the first place" (cleaned up)).

13        Notably, this prohibition on *systematic* removal programs does not preclude the

14  State from removing known noncitizen voters from the rolls; as the Eleventh Circuit

15  explained, "the 90 Day Provision permits removals based on *individualized* information

16  at any time." *Arcia*, 772 F.3d at 1346 (emphasis added). But here, Plaintiffs have not even

17  alleged, much less proved, that any individual federal-only voters are actually noncitizens.

18  *Cf. Richer v. Fontes*, No. CV-24-0221-SA, slip op. at 6 (Ariz. Sept. 20, 2024), https://

19  www.azcourts.gov/Portals/201/ASC-CV240221%20-%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%20-%20FILED%2

20  0-%20DECISION%20ORDER.pdf (modification of voter registrations not appropriate

21  where "parties do not suggest that they believe the Affected Voters are actually not United

22  States citizens"); Brief of Arizona Republican Party as Amicus Curiae in Support of

23  Respondent at 1–3, *Richer v. Fontes*, No. CV-24-0221-SA (Ariz. Sept. 18, 2024),

24  https://www.azcourts.gov/Portals/201/2024_09_18_05270831-0-0000-BriefOfArizona

25  RepublicanPartyA.PDF (acknowledging expansive reach of Section 8 and noting that "the

26  NVRA prohibits voter list maintenance" within ninety days of election).

**B. This Court cannot grant Plaintiffs' requested relief consistent with the Eleventh and Fourteenth Amendments.**

Moreover, Plaintiffs' requested relief must be denied due to the interplay of the Eleventh and Fourteenth Amendments to the U.S. Constitution.

The Eleventh Amendment prohibits federal courts from "instruct[ing] state officials on how to conform their conduct to state law," even when such claims are "masked under federal law." *Bowyer*, 506 F. Supp. 3d at 716 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)). Here, although Plaintiffs repeatedly reference federal law and federal databases, four of their five causes of action—and *all* of the relief they seek in their motion—are solely concerned with what *Arizona* law requires of *Arizona* officials. *See* FAC 31–32; Mot. 2, 26.[3] Moreover, although generally "the Eleventh Amendment does not apply to counties and similar municipal corporations," *Pennhurst*, 465 U.S. at 123 n.34 (cleaned up), courts have found that "county and local officials can still be treated as state officials for Eleventh Amendment purposes when carrying out non-discretionary duties subject to state policy control," *Cassell v. Snyders*, 990 F.3d 539, 552 (7th Cir. 2021); *see also Brotherton v. Cleveland*, 173 F.3d 552, 566 (6th Cir. 1999) ("Where county officials are sued simply for complying with state mandates that afford no discretion, they act as an arm of the State.").

Accordingly, because the voter-registration obligations of Arizona's county recorders are set by state law and nondiscretionary (as, indeed, Plaintiffs' amended

---

[3] Plaintiffs attempt to tie their requested relief to the NVRA claim by characterizing it as a "requir[ement that] the Defendants [] conduct uniform and nondiscriminatory voter list maintenance." Mot. 2; *see also* FAC ¶¶ 191–99. But, as discussed above, *see supra* at 7–8, a mandatory injunction imposing new citizenship-verification requirements on county recorders is not a cognizable remedy for the violation of federal law they allege, and so this relief cannot be sought as a remedy for Plaintiffs' (legally unfounded) NVRA claim. And, at any rate, Plaintiffs' claim regarding submission of information to the Attorney General, *see* FAC ¶¶ 187–90, has no grounding whatsoever in federal law.

-11-

1    complaint underscores), a federal court cannot order Defendants to comply with the

2    requirements of Arizona's election statutes under these circumstances.

3        Notably, Eleventh Amendment immunity might not extend to the Maricopa County

4    Defendants, as the Ninth Circuit has held that a defendant's removal of an action to federal

5    court "affirmatively invokes federal judicial authority and therefore waives Eleventh

6    Amendment immunity from subsequent exercise of that judicial authority." *Embury v.*

7    *King*, 361 F.3d 562, 566 (9th Cir. 2004). The *Fourteenth* Amendment, however, precludes

8    the Court from ordering Maricopa County to perform list-maintenance and voter-removal

9    programs distinct from those undertaken by Arizona's other fourteen counties. Courts

10   have recognized that a "lack of statewide standards [that] results in a system that deprives

11   citizens of the right to vote based on where they live" offends constitutional guarantees of

12   equal protection. *Ne. Ohio Coal. for Homeless v. Husted*, 837 F.3d 612, 635 (6th Cir.

13   2016); *see also, e.g.*, *Bush v. Gore*, 531 U.S. 98, 104–05 (2000) (per curiam) ("Having

14   once granted the right to vote on equal terms, the State may not, by later arbitrary and

15   disparate treatment, value one person's vote over that of another."). Subjecting *some* but

16   not *all* of Arizona's federal-only voters to potentially disenfranchising scrutiny would risk

17   precisely the sort of arbitrary and disparate treatment that the Fourteenth Amendment

18   abhors—especially where the franchise is concerned.

19       Taken together, the Eleventh and Fourteenth Amendments foreclose Plaintiffs'

20   requested relief. Because "[n]either courts nor states are exempt from the requirements of

21   the constitution" and judges do not "have the power to impose unconstitutional remedies,"

22   *Johnson v. Mortham*, 915 F. Supp. 1529, 1558 (N.D. Fla. 1995) (three-judge court),

23   Plaintiffs' motion must be denied.

24   **IV.    Plaintiffs are not otherwise entitled to preliminary relief.**

25       Plaintiffs ask the Court to "issue a temporary restraining order and preliminary

26   injunction requiring the Defendants to submit 1373/1644 Requests to DHS and to 'make

1    available' and 'provide' to the Arizona Attorney General the information about Federal-

2    Only Voters required by A.R.S. § 16-143," Mot. 26—thus "seek[ing] to alter the status

3    quo ante" through a "mandatory injunction," *Am. Freedom Def. Initiative v. King County*,

4    796 F.3d 1165, 1173 (9th Cir. 2015) (cleaned up). "Mandatory injunctions," however, are

5    "particularly disfavored" and "not granted unless extreme or very serious damage will

6    result and are not issued in doubtful cases." *Id.* (cleaned up).

7        As discussed below, Plaintiffs fail to satisfy even the lower bar for a prohibitory

8    injunction: They cannot succeed on the merits and the equities militate strongly against

9    preliminary relief. Plaintiffs therefore cannot possibly satisfy the higher burden of

10   securing a mandatory injunction.

11       **A.     Plaintiffs cannot succeed on the merits.**

12       Because Plaintiffs' claims fail as a matter of law, *see supra* at 3–8, they are not

13   entitled to preliminary relief, *see Self-Realization Fellowship Church v. Ananda Church*

14   *of Self-Realization*, 59 F.3d 902, 913 (9th Cir. 1995).

15       **B.     The equities foreclose immediate relief.**

16       Even if Plaintiffs could show a likelihood of success on the merits, their claims are

17   barred by laches, the *Purcell* doctrine, and other equitable considerations.

18       **1.     The *Purcell* doctrine forecloses late-hour, disruptive changes to**
         **election rules.**
19
20       The U.S. Supreme Court has repeatedly recognized that courts generally should not

21   alter election rules "in the period close to an election," *Merrill v. Milligan*, 142 S. Ct. 879,

22   880 (2022) (Kavanaugh, J., concurring). This is because "[c]ourt orders affecting

23   elections, especially conflicting orders, can themselves result in voter confusion and

24   consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4–

25   5 (2006) (per curiam); *see also, e.g.*, *Richer*, slip op. at 6–7 (applying *Purcell* to reject

26   late-hour request for modification of voter registrations).

Here, the risks of disruption, hardship, and even disenfranchisement are indefensibly and unacceptably high. Plaintiffs' belatedly sought relief would force Arizona election officials to divert their attention from the final stages of preparation for a high-interest presidential election, one for which early voting is set to begin on October 9—just 13 days away. *See Elections Calendar & Upcoming Events*, Ariz. Sec'y of State, https://azsos.gov/elections/voters/elections-calendar-upcoming-events (last visited Sept. 26, 2024). In addition to the enormous logistical and administrative hurdles Defendants and their staffs must already clear as November 5 approaches, Plaintiffs would require an entirely new system of citizenship checks for *42,301* registered voters—all of whom have, of course, attested to their citizenship—and for all future registrants as well. As Justice Kavanaugh noted four years ago, "running a statewide election is a complicated endeavor" involving a "massive coordinated effort" by "state and local officials and volunteers," which means that "[w]hen an election is close at hand, the rules of the road should be clear and settled." *DNC v. Wis. State Legislature*, 141 S. Ct. 28, 31, 34–35 (2020) (Kavanaugh, J., concurring) (upholding stay of district court decision that changed state election rules "too close to an election"). Plaintiffs cannot hastily write new rules for Arizona's county election officials less than two months before election day.

For Arizona voters, Plaintiffs' lawsuit would impose late-hour harassment and disenfranchisement. Their requested relief would immediately subject all federal-only voters to additional investigation by DHS and require that their names and applications be sent to the Attorney General—unwarranted scrutiny that, the *Mi Familia Vota* court noted, "deter[s potential registrants] from registering to vote for fear of potentially subjecting themselves or a family member to scrutiny by law enforcement or prosecution." 2024 WL 862406, at *27. Moreover, given that Plaintiffs ask Defendants to implement new policies and procedures in the midst of the election calendar and that the PCQS may, by the department's own concession, "display inaccurate data due to inaccuracies in underlying

source IT systems," *Privacy Impact Assessment for the Person Centric Query Service*, DHS 7 (Mar. 8, 2016), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-pcqs-march2016.pdf, the risk of mismatch, accidental cancellation, or other error is unacceptably high. This further implicates *Purcell*, as the Arizona Supreme Court recently recognized: The court refused to change the registrations of thousands of voters affected by a clerical error "where there is so little time remaining before the beginning of the 2024 General Election." *Richer*, slip op. at 6–7; *see also* Brief of Arizona Republican Party, *supra*, at 10 (arguing for application of *Purcell* where last-minute changes to voter registrations "would gravely and wantonly undermine [] confidence" in elections).

The U.S. Supreme Court and other appellate courts have regularly barred disruptive changes to voting and election procedures proposed, as here, too close to elections. *See, e.g.*, *Robinson v. Callais*, 144 S. Ct. 1171, 1171 (2024) (citing *Purcell* and granting stay in redistricting case six months before general election); *Merrill*, 142 S. Ct. at 880 (similar); *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371 (11th Cir. 2022) (applying *Purcell* to stay injunction issued less than four months before election that "implicates voter registration—which is currently underway—and purports to require the state to take action now"); *Thompson v. DeWine*, 959 F.3d 804, 813 (6th Cir. 2020) (per curiam) (applying *Purcell* where election was "months away" and other "interim deadlines" were imminent). As of the filing of this brief, election day is a mere five weeks away; ballots have already been mailed to UOCAVA voters; the last day to register in Arizona—October 7—is less than two weeks away; early voting begins in two weeks; and election officials are advised to print the poll lists—the lists of eligible voters—on October 11, less than three weeks from now. *Elections Calendar*, *supra*. Under these circumstances, and given that Plaintiffs seek to impose a new, extra-statutory citizenship-verification process that would burden election officials and discourage political participation across the state, "a due regard for the public interest in orderly

1  elections support[s] the [] Court's discretionary decision to deny a preliminary

2  injunction." *Benisek v. Lamone*, 585 U.S. 155, 160 (2018) (per curiam).

3                          **2.**        **Plaintiffs have not established any risk of imminent injury.**

4          Plaintiffs' five-week delay in bringing their motion for a temporary restraining

5  order and preliminary injunction alone suggests that they are not at risk of irreparable

6  harm. *See, e.g.*, *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc) (delay

7  in seeking preliminary relief "undercut [] claim of irreparable harm"). This is especially

8  true given that Arizona is now past the ninety-day NVRA cutoff. *See supra* at 8–10.

9          In any event, Plaintiffs have further failed to demonstrate a risk of irreparable

10  injury. They claim harm through vote dilution and the expenditure of resources,

11  suggesting that they have "plausibly demonstrated the likelihood that their constitutional

12  rights will be violated because of disenfranchisement through vote dilution." Mot. 22–24.

13  As discussed above, *see supra* at 2–3, Plaintiffs' theory of unconstitutional vote dilution

14  is inherently flawed and cannot support relief, injunctive or otherwise. Moreover—and

15  significantly, given that the specter of vote dilution animates their entire lawsuit—

16  Plaintiffs present *no* compelling evidence that noncitizens have voted or will vote in

17  Arizona's federal elections. *Cf. Mi Familia Vota*, 2024 WL 862406, at *16 ("[N]on-

18  citizens voting in Arizona is quite rare, and non-citizen voter fraud in Arizona is rarer

19  still."). The closest Plaintiffs come to actual evidence is a single August 2024 poll of 1,187

20  individuals identified as "Arizona Likely Voters," 22 of whom (1.85%) apparently stated

21  that they were not U.S. citizens at the time the poll was taken. *NumberUSA August 2024*

22  *Arizona*, Rasmussen Reports, https://www.rasmussenreports.com/public_content/

23  politics/partner_surveys/crosstabs_2_numbers_usa_arizona_august_13_17_2024 (last

24  visited Sept. 26, 2024). That's it. Other than citing that poll, whose methodology is not

25  available and which reveals nothing concrete about the risk of noncitizen voting, Plaintiffs

26  have offered *no* evidence that noncitizens have or plan to cast ballots in Arizona's

elections. They certainly have not identified a single noncitizen who has voted in Arizona—nor, indeed, a single noncitizen among the 42,301 federal-only voters in the state, every one of whom swore under penalty of perjury that they were U.S. citizens when they registered to vote. Plaintiffs cannot overcome that with pure speculation. *Cf. Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir.1985) ("affidavits [that] are conclusory and without sufficient support in facts" will not support finding of irreparable injury).

Plaintiffs' lack of credible evidence likewise forecloses any claim based on the expenditure of resources. *See* Mot. 24. Spending money chasing phantoms (or educating voters about nonexistent threats to election integrity) cannot give rise to a credible injury.

### 3. Neither the balance of harms nor public interest supports Plaintiffs' request.

There is no dispute that "[t]he public has a strong interest in exercising the fundamental political right to vote" and that "the public interest favors permitting as many qualified voters to vote as possible." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247–48 (4th Cir. 2014) (cleaned up). Plaintiffs present no legitimate evidence or inference that the fundamental right to vote is in jeopardy in Arizona. By contrast, the late-hour relief they seek—which would serve to intimidate and even disenfranchise voters, as well as disrupt election officials' final preparations for the fast-approaching presidential election—clearly undermines the political process and threatens eligible voters' ability to access the franchise. The public interest therefore militates against their request for relief.

### CONCLUSION

For these reasons, Plaintiffs' motion for a temporary restraining order and preliminary injunction should be denied and their claims dismissed with prejudice.

1 Dated:  September 26, 2024   **HERRERA ARELLANO LLP**

2

3             Roy Herrera
             Daniel A. Arellano
             1001 North Central Avenue, Suite 404

4             Phoenix, Arizona 85004

5

6            **PERKINS COIE LLP**

7         By:  */s/ Alexis E. Daneman*
             Alexis E. Danneman

8             2525 East Camelback Road, Suite 500
             Phoenix, Arizona 85016-4227

9             Jonathan P. Hawley*
             Heath L. Hyatt*

10            1201 Third Avenue, Suite 4900
             Seattle, Washington 98101-3099

11           *Attorneys for the Democratic National Committee*

12          *Motion for admission pro hac vice forthcoming*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**CERTIFICATE OF SERVICE**

I hereby certify that on September 26, 2024, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

/s/ Indy LaFever

1