D. Andrew Gaona (028414)
Austin C. Yost (034602)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
T: (602) 381-5486
agaona@cblawyers.com
ayost@cblawyers.com

Lalitha D. Madduri*
Christopher D. Dodge*
Tyler L. Bishop*
Renata O'Donnell*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20001
T: (202) 968-4330
lmadduri@elias.law
cdodge@elias.law
tbishop@elias.law
rodonnell@elias.law

*Attorneys for Proposed Intervenor-Defendants*
*Voto Latino and One Arizona*

*Admitted Pro Hac Vice

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Strong Communities Foundation of Arizona Incorporated, and Yvonne Cahill, <br><br> Plaintiffs, <br><br> v. <br><br> Stephen Richer, in his official capacity as Maricopa County Recorder, et al., <br><br> Defendants. | No. CV-24-02030-PHX-KML <br><br> **VOTO LATINO AND ONE ARIZONA'S [PROPOSED] RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

1

## <u>**TABLE OF CONTENTS**</u>

BACKGROUND ............................................................................................................. 2

LEGAL STANDARD ................................................................................................... 4

ARGUMENT ................................................................................................................. 4

I.   Plaintiffs lack standing. ............................................................................. 4

II.   The relief Plaintiffs seek is barred by the NVRA's 90-day quiet period. .............. 7

III.   Plaintiffs are unlikely to succeed on the merits. ...................................... 9

A. Plaintiffs' NVRA claim fails multiple times over. .......................... 9

1.   Plaintiffs failed to provide proper notice of their NVRA claim. ................. 9

2.   The NVRA's uniformity provision does not require the counties to submit DHS requests. .................................................................. 10

B. Plaintiffs are unlikely to succeed on their state law claims. ........................ 12

IV.   The equities tip sharply against Plaintiffs' requested injunction......................... 16

CONCLUSION ........................................................................................................... 17

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5

*Al Otro Lado v. Wolf,*
  952 F.3d 999 (9th Cir. 2020) ........................................................................ 16

6

7

*Am. United for Kids v. Rousseau,*
  985 F.3d 1075 (9th Cir. 2021) ........................................................................ 6

8

9

*Arcia v. Fla. Sec'y of State,*
  772 F.3d 1335 (11th Cir. 2014) ............................................................... 8, 9, 17

10

*Ariz. Minority Coal. for Fair Redist. v. Ariz. Indep. Redist. Comm'n,*
  220 Ariz. 587 (Ariz. 2009) ........................................................................... 15

11

12

*Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.,*
  464 F.3d 1003 (9th Cir. 2006) ...................................................................... 13

13

14

*Arizona v. Inter Tribal Council of Ariz.,*
  570 U.S. 1 (2013) .................................................................................. 2, 15

15

16

*Assurance Wireless USA v. Reynolds,*
  100 F.4th 1024 (9th Cir. 2024) ..................................................................... 16

17

*Baker v. Carr,*
  369 U.S. 186 (1962) ................................................................................... 6

18

19

*Bates v. UPS, Inc.,*
  511 F.3d 974 (9th Cir. 2007) ......................................................................... 7

20

21

*Bellitto v. Snipes,*
  268 F. Supp. 3d 1328 (S.D. Fla. 2017) ........................................................ 9, 10

22

23

*Benisek v. Lamone,*
  585 U.S. 155 (2018) .................................................................................. 16

24

*Bost v. Illinois State Bd. of Elections,*
  114 F.4th 634 (7th Cir. 2024) ........................................................................ 6

25

26

*Bowyer v. Ducey,*
  506 F. Supp. 3d 699 (D. Ariz. 2020) ............................................................ 5, 6

27

28

*City & County of San Francisco v. USCIS,*
  944 F.3d 773 (9th Cir. 2019) ......................................................................... 4

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
  657 F.3d 936, 943 (9th Cir. 2011 .............................................................. 6, 7

*Corbin v. Ryan*,
  No. CV 09-2677-PHX-JAT, 2010 WL 3327717 (D. Ariz. Aug. 24, 2010) ............... 16

*Donald J. Trump for President, Inc. v. Cegavske*,
  488 F. Supp. 3d 993 (D. Nev. 2020) ......................................................... 6

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ................................................................................ 7

*Flores v. Bennett*,
  635 F. Supp. 3d 1020 (E.D. Cal. 2022) ...................................................... 5

*Hennessy-Waller v. Snyder*,
  529 F. Supp. 3d 1031 (D. Ariz. 2021), *aff'd sub nom.*
  *Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022) ............................................... 4

*Lance v. Coffman*,
  549 U.S. 437 (2007) ............................................................................... 7

*Lopez v. Brewer*,
  680 F.3d 1068 (9th Cir. 2012) ................................................................. 4

*Marchant v. N.Y.C. Bd. of Elections*,
  815 F. Supp. 2d 568 (E.D.N.Y. 2011) ...................................................... 16

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
  571 F.3d 873 (9th Cir. 2009) ............................................................. 4, 16

*Mi Familia Vota v. Fontes*,
  691 F. Supp. 3d 1077 (D. Ariz. 2023) ............................................. 8, 11, 17

*Mi Familia Vota v. Fontes*,
  No. CV-22-00509, 2024 WL 862406 (D. Ariz. Feb. 29, 2024) ................. 2, 11, 12

*N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*,
  No. 1:16-cv-1274, 2016 WL 6581284 (M.D.N.C. Nov. 4, 2016) ..................... 8, 9

*Nat'l Council of La Raza v. Cegavske*,
  800 F.3d 1032 (9th Cir. 2015) ................................................................. 9

*O'Rourke v. Dominion Voting Sys. Inc.*,
  No. 20-CV-03747-NRN, 2021 WL 1662742 (D. Colo. Apr. 28, 2021),
  *aff'd*, No. 21-1161, 2022 WL 1699425 (10th Cir. May 27, 2022) ..................... 6

*Obama for Am. v. Husted,*
   697 F.3d 423 (6th Cir. 2012) ........................................................................ 17

*Paher v. Cegavske,*
   457 F. Supp. 3d 919 (D. Nev. 2020)................................................................. 5

*Project Vote v. Blackwell,*
   455 F. Supp. 2d 694 (N.D. Ohio 2006).......................................................... 12

*Pub. Int. Legal Found. v. Boockvar,*
   370 F. Supp. 3d 449 (M.D. Pa. 2019) ............................................................ 10

*Richer v. Fontes,*
   No. CV-24-0221-SA, 2024 WL 4299099 (Ariz. Sept. 20, 2024)........ 2, 4, 9, 12, 15, 17

*Sanford v. MemberWorks, Inc.,*
   625 F.3d 550 (9th Cir. 2010) ......................................................................... 12

*Scott v. Schedler,*
   771 F.3d 831 (5th Cir. 2014) ...................................................................... 9, 10

*Testerman v. N.H. Sec'y of State,*
   No. 23-CV, 2024 WL 1482751 (D.N.H. Jan. 9, 2024)..................................... 6

*Wilderness World, Inc. v. Dep't of Revenue,*
   182 Ariz. 196 (Ariz. 1995).............................................................................. 14

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008)........................................................................................ 4, 16

*Wood v. Raffensperger,*
   981 F.3d 1307 (11th Cir. 2020) ....................................................................... 6

*Yazzie v. Hobbs,*
   977 F. 3d 964 (9th Cir. 2020) .......................................................................... 4

**Statutes**

A.R.S. § 16-121.01 ................................................................................................ 2

A.R.S. § 16-121.01(D)............................................................................. 12, 13, 14

A.R.S. § 16-142 .................................................................................................... 9

A.R.S. § 16-143(A) ............................................................................................. 15

A.R.S § 16-165 ..................................................................................................... 2

A.R.S. § 16-165(I) ............................................................................. 5

A.R.S. § 16-165(F) ........................................................................... 12

A.R.S. § 16-165(K) ........................................................................... 15

A.R.S § 16-166 .................................................................................. 2

A.R.S. § 16-166(F) ............................................................................. 2

8 U.S.C. § 1373 ................................................................................ 13

8 U.S.C. § 1373(c) .............................................................................. 3

8 U.S.C. § 1644 ............................................................................. 3, 13

52 U.S.C. § 20507(b)(1) ................................................................. 2, 11

52 U.S.C. § 20507(c)(2) ........................................................... 1, 3, 7, 8

52 U.S.C. § 20510(b)(1) ................................................................... 1, 9

52 U.S.C. § 20510(b)(3) ...................................................................... 9

Act of Apr. 22, 2022, 2022 Ariz. Leg. Serv. Ch. 174 ...................... 15

Act of Mar. 30, 2022, 2022 Ariz. Legis. Serv. Chapter 99 ............. 15

**Other Authorities**

11A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. § 2948.1 (3d
ed. 2024) ..................................................................................... 17

*Privacy Impact Assessment for PCQS* at 7, U.S. Dep't of Homeland Sec.
(March 8, 2016),
https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-
pcqs-march2016.pdf ...................................................................... 14

*Privacy Impact Assessment Update for the USCIS PCQS Supporting
Immigration Status Verifiers* at 2, U.S. Dep't of Homeland Sec. (June 8,
2011), https://tinyurl.com/8c34jpad .............................................. 14

*State of Ariz. 2023 Elections Procedure Manual* 36-48, Ariz. Sec'y of State
(Dec. 30, 2023) ............................................................................... 2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

With voting already underway, Plaintiffs demand an extraordinary mandatory injunction to compel every Arizona county to submit inquiries to the U.S. Department of Homeland Security ("DHS") regarding the citizenship of every duly registered Federal-only voter. Plaintiffs request this sweeping relief not based on any actual violations of state or federal law, but instead on the baseless assumption that Federal-only voters are in fact noncitizens scheming to cast fraudulent votes. Notably, although false accusations about noncitizens voting were prominently and repeatedly made in connection with the 2020 election, none of the extensive post-election litigation brought to undermine the results of that election in Arizona credibly alleged—much less found—that noncitizens were in fact voting in the state's elections. Similarly, a recent federal case involving Arizona laws based on the same false assumptions found that noncitizen voting is not a threat to the state's elections. Plaintiffs' attempt to revive these false claims to justify inserting entirely unnecessary and deeply disruptive changes to election administration in the middle of an election should be swiftly and thoroughly rejected.

*First*, Plaintiffs fail to show that they have suffered any injury that is redressable by this Court, and thus lack standing. *Second*, the injunction Plaintiffs seek is doubly barred by the NVRA, which prohibits any systematic purge programs within 90 days of a federal election and requires a mandatory pre-litigation notice that Plaintiffs failed to provide. 52 U.S.C. §§ 20507(c)(2)(A), 20510(b)(1). *Third*, Plaintiffs fail to demonstrate any prospect of success on the merits. Plaintiffs' NVRA claim identifies no inconsistent or discriminatory list-maintenance practice, and they offer no support for their novel theory that the relief for their alleged violation would be a mandatory injunction requiring new maintenance protocols for all Federal-only voters. Plaintiffs' state-law claims fail for similar reasons— they identify no unlawful list-maintenance procedures and nothing in Arizona law requires the relief they seek. Moreover, the fundamental premise of their claim—that Federal-only voters' registration is suspect because they have not provided documentary proof of citizenship (DPOC)—was rejected just ten days ago by the Arizona Supreme Court, which

correctly found that a lack of DPOC is not evidence that voters are "not United States citizens." *Richer v. Fontes*, No. CV-24-0221-SA, 2024 WL 4299099, at *2 (Ariz. Sept. 20, 2024). *Finally*, the equities tip sharply against Plaintiffs' requested injunction—which would amount to a last-minute, error-prone purge program that would disenfranchise eligible voters in the upcoming election. The Court should deny Plaintiffs' motion.

## **BACKGROUND**

Arizona law requires individuals registering to vote to provide "satisfactory evidence of citizenship," A.R.S. § 16-166(F), also known as "DPOC." In 2013, the U.S. Supreme Court held that the NVRA preempts Arizona's DPOC requirement as applied to persons registering to vote for federal elections with a federally provided voter registration form, which does not require DPOC. *Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1, 18–20 (2013) ("*ITCA*"). Following that decision, Arizona established a bifurcated voter-registration system: voters who provide DPOC are registered as "full" voters eligible to participate in federal, state, and local elections, while voters who register using the federal form and do not provide DPOC are registered as "Federal-only" voters and are not permitted to vote for state and local offices. *Mi Familia Vota v. Fontes*, No. CV-22-00509, 2024 WL 862406, at *2 (D. Ariz. Feb. 29, 2024) (summarizing this background).[1]

Arizona has enacted specific procedures to verify whether people who seek to register to vote are qualified, and to remove individuals who are no longer qualified to vote. *See* A.R.S. §§ 16-121.01 (registration requirements), 16-165 (procedures for initiating removal procedures for potentially ineligible individuals), 16-166 (procedures for verifying residence and citizenship); *State of Ariz. 2023 Elections Procedure Manual* 36–48, Ariz. Sec'y of State (Dec. 30, 2023) ("EPM"). Federal law also regulates Arizona's list-maintenance practices. For example, the NVRA requires that any maintenance programs or activities be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1). The NVRA

---

[1] As Plaintiffs acknowledge (ECF No. 41 at 9), *Mi Familia Vota* is related to this action. That provides a strong reason to grant Proposed Intervenors' Motion to Intervene here, as both organizations are directly involved in the case—Voto Latino as a plaintiff and One Arizona as the parent organization of several other plaintiffs. *See* ECF No. 5 at 10–11.

further prohibits any systematic voter removal programs within 90 days of a federal election, a period that began August 7 for the November election. *See id.* § 20507(c)(2)(A).

In the complaint and their PI motion—filed just six days before voting began in Arizona—Plaintiffs claim that either the NVRA's uniformity provision or state law requires recorders to submit inquiries to DHS about the citizenship of *every* registered Federal-only voter, and to provide certain information about these voters to the state Attorney General. *See* First Am. Compl. ¶¶ 164–99, ECF No. 12 ("FAC"); *see also* Mot. to Intervene as Defs. at 4, ECF No. 5 ("Mot. to Intervene") (summarizing Plaintiffs' state law claims). Plaintiffs rely upon decades-old federal immigration laws: 8 U.S.C. § 1644, which provides only that "no State or local government entity may be prohibited . . . from sending to or receiving from . . . [DHS] information regarding the immigration status . . . of an alien in the United States," and 8 U.S.C. §1373(c), which Plaintiffs claim requires DHS to respond to inquiries. Plaintiffs seek a mandatory injunction compelling Defendants to immediately submit DHS requests (what Plaintiffs call "1373/1644 Requests") for all registered Federal-only voters and provide the Attorney General with the registration applications of every such voter for investigation—all with the goal of purging these registered voters from the rolls ahead of November. Pls.' Mot. for Prelim. Inj. at 25–26, ECF No. 16 ("PI Mot.").

After Plaintiffs filed their PI motion, the Secretary of State announced that his office had discovered that more than 97,000 Arizonans registered as "full" voters were incorrectly labeled by the state's voter registration systems as having produced DPOC due to an error in the state's driver's license database. In response, the Maricopa County Recorder sought an order from the Arizona Supreme Court requiring that those voters' registrations be changed to Federal-only status. The Arizona Republican Party opposed that request, arguing that any change to these voters' registration status should not occur "on the eve of an election where doing so may cause massive voter disenfranchisement."[2] The Supreme Court of Arizona agreed, recognizing that there is too "little time remaining before the

---

[2] Br. of Ariz. Republican Party as Amicus Curiae at 1, *Richer v. Fontes*, No. CV-24-0221-SA (Ariz. Sept. 18, 2024), available at https://www.azcourts.gov/Portals/201/2024_09_18_05270831-0-0000-BriefOfArizonaRepublicanPartyA.PDF.

beginning of the 2024 General Election" to alter registrations of Arizona voters. *Richer*, 2024 WL 4299099, at \*3. As the Court recognized and all parties agreed, a lack of DPOC is not evidence that voters are "not United States citizens." *Id.* at \*2.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that [they are] likely to succeed on the merits, . . . likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (cleaned up).

A plaintiff seeking a "mandatory," rather than "prohibitory," injunction must clear an even higher threshold. *Hennessy-Waller v. Snyder*, 529 F. Supp. 3d 1031, 1036–37 (D. Ariz. 2021), *aff'd sub nom. Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022). A "prohibitory injunction" freezes the positions of the parties until the court can hear the case on the merits, while a "mandatory injunction . . . orders the responsible party to take action pending the determination of the case on its merits." *Snyder*, 28 F.4th at 111. Because mandatory injunctions go "well beyond simply maintaining the status quo," they are "particularly disfavored." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quotation omitted).

## ARGUMENT

### I.    Plaintiffs lack standing.

To meet Article III's requirements at this stage, Plaintiffs must make a "clear showing" as to each standing element: (1) a concrete, particularized, and actual or imminent injury that is (2) traceable to Defendants and (3) redressable by a favorable decision. *Yazzie v. Hobbs*, 977 F. 3d 964, 966 (9th Cir. 2020) (requiring "clear showing" of standing at preliminary injunction stage). Mere allegations are insufficient: standing must be supported by "evidence . . . submitted in support of [Plaintiffs'] motion." *City & County of San*

*Francisco v. USCIS*, 944 F.3d 773, 787 (9th Cir. 2019) (quotation omitted). Plaintiffs fail to meet this standard.

**A.    Plaintiffs fail to make a clear showing of an injury in fact.**

*First*, Plaintiffs argue that Defendants' list-maintenance practices inflict an injury on Ms. Cahill because—as a naturalized citizen subject to SAVE searches—she is treated differently from voters who are not subject to SAVE searches. PI Mot. at 16. But Plaintiffs fail to offer evidence sufficient to make a "clear showing" of this alleged injury, relying on pleading allegations alone. *See Flores v. Bennett*, 635 F. Supp. 3d 1020, 1030 (E.D. Cal. 2022) ("This 'clear showing' requires factual support beyond the allegations of the complaint[.]" (cleaned up)).

Even if Plaintiffs could rely on pleadings alone, they do not plausibly allege that Ms. Cahill is treated differently from other voters. Under H.B. 2243, Arizona is required to run SAVE searches only for voters who did not provide DPOC. *See* A.R.S. § 16-165(I). But Ms. Cahill alleges that she "plans to vote in Arizona's upcoming federal *and state* elections," FAC ¶ 19 (emphasis added), meaning she presumably *has* provided DPOC—a requirement to be a full-ballot voter in Arizona—and thus is not subject to SAVE searches. The FAC nowhere explains why she would be subject to such a search.

*Second*, Plaintiffs claim that Defendants have failed to verify the citizenship of Federal-only voters and remove "foreign citizens" from voter rolls "diluting" Ms. Cahill's vote. PI Mot. at 16–17. But such rank speculation fails to clearly show—or even plausibly allege—any concrete injury. More fundamentally, courts routinely reject the notion that this theory of "vote dilution" constitutes an injury-in-fact. "Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any" voter in the state. *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926 (D. Nev. 2020). "Such claimed injury therefore does not satisfy the requirement that Plaintiffs must state a concrete and particularized injury." *Id.*; *see also Bowyer v. Ducey*, 506 F. Supp. 3d 699, 712 (D. Ariz. 2020) (rejecting vote dilution claim as a generalized grievance). Indeed, a "veritable tsunami" of courts, including within this Circuit, have rejected this theory of standing.

1  *O'Rourke v. Dominion Voting Sys. Inc.*, No. 20-CV-03747-NRN, 2021 WL 1662742, at *9

2  (D. Colo. Apr. 28, 2021) (collecting cases), *aff'd*, No. 21-1161, 2022 WL 1699425 (10th

3  Cir. May 27, 2022); *see also Bost v. Illinois State Bd. of Elections*, 114 F.4th 634, 640 (7th

4  Cir. 2024) (holding vote dilution theory to be a "generalized grievance").[3]

5      *Third*, Plaintiffs allege these same injuries—different treatment for naturalized

6  citizens who are Federal-only voters and vote dilution—on behalf of EZAZ.org's members.

7  PI Mot. at 17. But this theory fails for the same reasons they fail for Ms. Cahill. Plaintiffs'

8  vote dilution theory is both unsupported by *any* evidence and legally invalid regardless. As

9  with Ms. Cahill, Plaintiffs fail to show any EZAZ.org member suffers from differential

10  treatment as a naturalized Federal-only voter—indeed, the declaration submitted on behalf

11  of the organization by Merissa Hamilton (as well as the FAC) is silent on the matter. *See*

12  *generally* PI Mot., Ex. A, ECF No. 16-1 ("Hamilton Decl."); FAC.[4]

13      *Fourth*, Plaintiffs claim that EZAZ.org has organizational standing. PI Mot. at 18.

14  An organization may establish standing by showing that a challenged "policy frustrates the

15  organization's goals and requires the organization to expend resources in representing

16  clients they otherwise would spend in other ways." *Comite de Jornaleros de Redondo Beach*

17  *v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (cleaned up). Plaintiffs fail to

18  clearly show such an injury. In fact, they present no evidence at all that their "mission"

19  suffers due to the Federal-only list-maintenance they challenge. *See* Hamilton Decl. For that

---

[3] Plaintiffs' generalized vote-dilution theory is different in kind from a vote-dilution injury in the redistricting context, where a law minimizes a voter's or a group of voters' voting strength *as compared to other voters*. *See, e.g., Baker v. Carr*, 369 U.S. 186, 207–08 (1962). "As courts have routinely explained, vote dilution is a very specific claim that involves votes being weighed differently and cannot be used generally to allege voter fraud." *Bowyer*, 506 F. Supp. at 711; *see also Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020) (explaining why vote dilution may be an injury "in the racial gerrymandering and malapportionment contexts" but not in the context raised here); *Bost*, 114 F.4th at 640-41 (similar). No such injury exists where the counting of alleged "illegitimate" ballots would "dilute" the voting power of all Arizonians equally. *See, e.g., Wood*, 981 F.3d at 1314–15 ("Vote dilution in this context is a paradigmatic generalized grievance that cannot support standing." (cleaned up); *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1000 (D. Nev. 2020) (similar); *Testerman v. N.H. Sec'y of State*, No. 23-CV, 2024 WL 1482751, at *4 (D.N.H. Jan. 9, 2024) (similar).

[4] Plaintiffs also make virtually no effort to establish the necessary associational standing requirements. *See Am. United for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021).

1   reason alone, their organizational standing fails. And although they claim diversionary

2   harms, *see* PI Mot. at 18–19, Plaintiffs fail to show Arizona's list-maintenance practices

3   "require[]" such expenditures, *Redondo Beach*, 657 F.3d at 943, most of which amount to

4   Plaintiffs trying to "spend [their] way into standing simply by expending money to gather

5   information and advocate against the defendant's action." *FDA v. All. for Hippocratic Med.*,

6   602 U.S. 367, 370 (2024). Without substantiating the connection between Defendants'

7   alleged violations and Plaintiffs' diversion of resources, Plaintiffs' concern about whether

8   the law "has not been followed" presents "precisely the kind of undifferentiated, generalized

9   grievance about the conduct of government that [courts] have refused to countenance."

10   *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam). But "a citizen does not have

11   standing to challenge a government regulation simply because the plaintiff believes that the

12   government is acting illegally." *All. for Hippocratic Med.*, 602 U.S. at 381.

13      **B.  Plaintiffs fail to make a clear showing of redressability.**

14      Plaintiffs also lack standing because there is no reason to think their demanded relief

15   will redress *any* of their purported harms. Plaintiffs fail to clearly show that DHS inquiries

16   will likely result in identifying purported noncitizens or provide information Defendants do

17   not already have. *See also infra* § III-B. The connection between Plaintiffs' claimed harms

18   and requested relief is deeply speculative. How do DHS inquiries for Federal-only voters

19   remedy Ms. Cahill's purported differential treatment when it has nothing to do with who is

20   subject to SAVE searches? How will it impact EZAZ.org's various alleged diversionary

21   harms, such as difficulty recruiting volunteers or convincing voters their ballot will count?

22   Plaintiffs do not explain, and the Court can only guess. Plaintiffs thus fail to make a clear

23   showing that their purported injuries are "likely to be redressed by a favorable decision."

24   *Bates v. UPS, Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (cleaned up).

25   **II.  The relief Plaintiffs seek is barred by the NVRA's 90-day quiet period.**

26      The NVRA also bars Plaintiffs' requested relief. It strictly prohibits systematic

27   purges within 90 days of a federal election; for the election now underway, that period

28   began on August 7. 52 U.S.C. § 20507(c)(2)(A). This safeguard is not only mandated by

statute, it is also necessary to prevent disenfranchisement because "systematic cancellation programs can cause inaccurate removal and eligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote." *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1093 (D. Ariz. 2023) (cleaned up). The NVRA thus purposefully "strikes a careful balance [by permitting such] programs at any time except for the 90 days before an election because that is when the risk of dis[en]franchising eligible voters is the greatest." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014).

The 90-day quiet period bars Plaintiffs' request to compel a systematic inquiry into Federal-only voters and the removal of purportedly ineligible voters for the ongoing election. *See* PI Mot. at 25–26. Plaintiffs' demanded relief—which would require systematic checks of tens of thousands of presently registered voters based on no individualized assessment—plainly falls within the NVRA's definition of a "any program . . . to systematically remove the names of ineligible voters." 52 U.S.C. § 20507(c)(2)(a). The NVRA's use of the phrase "'any program' suggests [the provision] has a broad meaning," and "strongly suggests that Congress intended [for it] to encompass programs of any kind." *Arcia*, 772 F.3d at 1344; *see also Mi Familia Vota*, 691 F. Supp. at 1093 (same). Courts have thus applied the provision to preclude *any* effort to remove "batches of registrations based on a set procedure." *Mi Familia Vota*, 691 F. Supp. at 1092 n.8 (citing *Arcia*, 772 F.3d at 1344); *see also N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 1:16-cv-1274, 2016 WL 6581284, at *6 (M.D.N.C. Nov. 4, 2016). That is precisely what Plaintiffs seek here, requesting an injunction that would seek to remove batches of voters based on mass requests to DHS for every Federal-only roster voter. PI Mot. at 25–26.

Any suggestion that Plaintiffs' requested relief constitutes an "individualized" removal fails. Such limited removals must be based on registrant-specific evidence and include "rigorous" safeguards to minimize the "chance for mistakes." *Mi Familia Vota*, 691 F. Supp. 3d at 1093 (quoting *Arcia*, 772 F.3d at 1344); *N.C. State Conf. of the NAACP*, 2016 WL 6581284, at *6 (similar). Plaintiffs' effort to force Defendants to submit DHS inquiries *en masse* cannot credibly be characterized as "individualized." In an analogous context, the

Eleventh Circuit rejected an argument that a program that relied on "computerized data-matching" of lists of voters to federal citizenship information was "individualized," because removals under the program would not be based on registrant-specific "information or investigation." *Arcia*, 772 F.3d at 1346; *see also, e.g.*, *N.C. State Conf. of the NAACP*, 2016 WL 6581284, at *5–6 (holding that system allowing residents to challenge lists of "hundreds [or] . . . thousands of voters within 90 days" of a federal election based on information that those voters had moved was a systematic programed barred by the NVRA's quiet period).[5] The NVRA's 90-day quiet period thus requires denying Plaintiffs' motion.

## III.     Plaintiffs are unlikely to succeed on the merits.

Plaintiffs also fail to show any prospect of success on the merits. As for their NVRA claim, Plaintiffs not only failed to comply with the statute's mandatory pre-suit notice requirement, but also fail to identify any NVRA violation. Their state-law claims fare no better: Nothing in Arizona law requires any of the relief Plaintiffs seek.

### A. Plaintiffs' NVRA claim fails multiple times over.

#### 1.   Plaintiffs failed to provide proper notice of their NVRA claim.

Plaintiffs' NVRA claim is barred because they did not provide the Secretary of State, Arizona's designated "chief state election officer" for NVRA-purposes, A.R.S. § 16-142, with the requisite notice necessary to establish statutory standing for a NVRA claim. A plaintiff seeking to bring a claim under the NVRA must show that they "provide[d] written notice of the violation to the chief election official of the State involved." 52 U.S.C. § 20510(b)(1); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1044 (9th Cir. 2015). "[F]ailure to provide notice is fatal," *Scott v. Schedler*, 771 F.3d 831, 836 (5th Cir. 2014), and plaintiffs who fail to supply the requisite notice lack "[statutory] standing to bring suit," *Bellitto v. Snipes*, 268 F. Supp. 3d 1328, 1332 (S.D. Fla. 2017) (quotation omitted).[6] The

---

[5] If Plaintiffs mean to suggest that a failure to produce DPOC alone supplies individualized suspicion that voters are "not United States citizens," that argument lacks merit because a lack of DPOC does not equate to a lack of citizenship. *Richer*, 2024 WL 4299099, at *2.

[6] Litigants can sometimes be excused from the notice requirement in circumstances not present here. *See* 52 U.S.C. § 20510(b)(3) (excusing plaintiff from providing written notice if violation occurred within 30 days of election).

notice must specify the NVRA violation that plaintiffs believe has occurred and must not be so "vague" as to deprive election officials of "an opportunity to attempt compliance" before facing suit. *Scott*, 771 F.3d at 836 (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir.1997)); *see also, e.g.*, *Bellitto*, 268 F. Supp. 3d at 1334 (notice must describe "exactly what . . . violations have been alleged").

There is no question that Plaintiffs failed to satisfy their obligation to provide the Secretary with adequate pre-suit notice of their NVRA claim. PI Mot. at 12 (citing 52 U.S.C. § 20507(b)(1)); *see* FAC ¶¶ 191-99 (Count V). The FAC states without support that this claim is "proper because the Plaintiffs 'provide[d] written notice of the violation to [Defendants].'" FAC ¶ 52 (quoting 52 U.S.C. § 20510(b)). Even if true, that notice failed to meet the NVRA's requirement to notify the "*state*'s chief election official" of a possible violation. *Pub. Int. Legal Found. v. Boockvar*, 370 F. Supp. 3d 449, 457 (M.D. Pa. 2019) (emphasis added) (barring suit because plaintiffs failed to satisfy "clear directive that a state's chief election official must receive notice of a violation" and that "constructive notice" through letters to other officials is insufficient). Nor do the letters provide the required notice of a possible NVRA violation, instead urging counties to "remove foreign citizens" from voter rolls and repeatedly claiming that "Arizona law"—but notably *not* the NVRA—requires Plaintiffs' requests. PI Mot., Ex. D at 1, ECF No. 16-4 ("Letter to S. Richer"); *see also id.* at 7 (threatening legal action to compel county recorders to fulfill "duties *under Arizona law*" (emphasis added). Nowhere in those letters did Plaintiffs identify any "violations of the NVRA," such that election officials would have had the "opportunity to attempt [NVRA] compliance" before facing suit. *Scott*, 771 F.3d at 836. Because Plaintiffs failed to satisfy the NVRA's pre-litigation notice requirements, they lack standing to pursue that claim at all.

> ### 2. The NVRA's uniformity provision does not require the counties to submit DHS requests.

Plaintiffs' NVRA claim also lacks any merit. The NVRA states in relevant part that "[a]ny State program or activity" to maintain voter rolls for elections for federal office must

be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act." 52 U.S.C. § 20507(b). Plaintiffs claim that Defendants are in violation of this requirement because Arizona law requires SAVE checks for Federal-only voters when they first register to vote, and such checks can only be conducted if the voter provides an alien number. This in turn allegedly places "greater scrutiny" on those who provide an alien number. PI Mot. at 20 (citing FAC ¶¶ 127–29, 192–99). Plaintiffs do not seek to enjoin this allegedly unlawful check. Instead, tellingly, they assert that it requires this Court to create from whole cloth an entirely separate and novel check through DHS as a remedy. But Plaintiffs neither identify a violation of the NVRA nor any basis to require DHS requests.

First, Plaintiffs ignore that, as the *Mi Familia Vota* Court held, the NVRA uniformity provision that Plaintiffs invoke "only applies to post-registration voter-roll maintenance, namely purges." 691 F. Supp. 3d at 1095 (citing 52 U.S.C. § 20507(b)(1)) (explaining that this provision "expressly addresses confirming rather than soliciting voter registration, speaks to ensuring the maintenance, not the enlargement, of current voter registration rolls"). Thus, the use of SAVE checks for voters during the *registration* process cannot create actionable non-uniformity in the state's list-*maintenance* process under the NVRA. *See id.* And, as Plaintiffs acknowledge, counties currently do not conduct SAVE checks as part of list-maintenance. Letter to S. Richer at 4–5; *see Mi Familia Vota*, WL 862406, at *6, 43. Plaintiffs' premise that certain Federal-only voters have been singled out for SAVE checks during list maintenance is thus simply wrong. PI Mot. at 20.[7]

But even if Plaintiffs could demonstrate that they are likely to succeed on their claim, there is *no* authority to support their novel proposition that the remedy for such a violation— instead of enjoining the allegedly discriminatory practice—is a mandatory injunction

---

[7] Though recorders do not use SAVE checks to conduct list-maintenance, the *Mi Familia Vota* Court held that the practice of conducting such checks only on voters who provide an alien number as part of regular checks of Federal-only voters would not run afoul of the NVRA's uniformity provision. 2024 WL 862406, at *43. That is so, the Court explained, because the "trigger" for county recorders to further investigate the citizenship status of registered voters is "uniform and nondiscriminatory: the voter has not submitted DPOC proving her citizenship," and all such voters are then subjected to checks against "multiple sources that may contain citizenship information." *Id.* at 42 (citing *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 764–66 (2018)).

imposing new burdens on other voters via the submission of a different kind of citizenship check that appears nowhere in state law. *See id.* at 26. Indeed, *each* of the authorities Plaintiffs rely upon confirms that enjoining an unlawful challenged practice is the proper remedy—not compelling an entirely separate and unrelated set of procedures. *E.g.*, *Mi Familia Vota*, 2024 WL 862406, at *57; *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 705 (N.D. Ohio 2006). In short, Plaintiffs' NVRA claim fails on every level—they lack standing to bring it, it fails on the merits, and the relief they seek is unavailable.

### B. Plaintiffs are unlikely to succeed on their state law claims.

While the Court need not reach the remaining state law claims, *see Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010), Plaintiffs also fail to show that Arizona law requires Defendants to submit requests to DHS, or that they have violated their duty to submit registration applications of all Federal-only voters to the Attorney General. PI Mot. at 21–22; *see* FAC ¶¶ 164–99 (Counts I–IV).

**Count I.** Plaintiffs first argue that Defendants are in violation of A.R.S. § 16-121.01(D), which requires recorders to "use all available resources to verify the citizenship" of a voter registration applicant submitted without DPOC "[w]ithin ten days." In Plaintiffs' view, the reference to "all available resources" coupled with no law prohibiting recorders from submitting DHS requests means that such requests are mandatory for every Federal-only voter. PI Mot. at 20; FAC ¶¶ 164–69 (Count I). Plaintiffs misread the statute.

To start, by its own terms, Section 16-121.01(D) applies only within "ten days after receiving an application for registration." The provision thus has no application here—where Plaintiffs complain about the recorders' refusal to submit DHS requests for Federal-only voters who have already been duly registered. PI Mot. at 21; *cf. Richer*, 2024 WL 4299099, at *2 (construing A.R.S. § 16-165(F), which calls for rejection of applications without DPOC, to apply only at the time the applicant applies, explaining that "the time for the county recorder to reject . . . applications" under the provision "has passed"). Contrary to Plaintiffs' theory, Section 16-121.01(D) imposes no duty to conduct new citizenship inquiries into existing registered voters.

Further, Plaintiffs wrongly assume that recorders' ability to submit DHS requests constitutes an "available resource" within the meaning of Section 16-121.01(D). *See* PI Mot. at 21. This theory is dubious for several reasons. The mere fact that DHS requests exist does not mean that they are "available" for recorders to "use" under the statute. If that were the case, it would mean that recorders must identify every possible resource maintained by anyone anywhere that theoretically contains citizenship information and seek to exhaust all such resources within 10 days of receiving a registration application without DPOC—an absurd reading that would overwhelm county recorders. *See Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006) (explaining "well-accepted rules of statutory construction caution [] that statutory interpretations which would produce absurd results are to be avoided" (cleaned up)). The far more sensible interpretation is that "available" means those resources recorders can personally access—or in other words, resources that are actually "available" to recorders—to identify citizenship information based on defined procedures.

Moreover, unlike the databases that recorders can themselves access, *see* EPM at 9, 36–48, recorders have no control over whether or how a federal agency would respond to such requests. While Plaintiffs insist that DHS *could* look up any Federal-only voters with only a name and date of birth using the "Person Centric Query Service," or "PCQS," they provide no evidence that DHS agents can or would in fact do so in the way Plaintiffs assume. *See* PI Mot. at 10–12, 21–22. The federal laws Plaintiffs rely on do not require DHS to use PCQS at all, *see* 8 U.S.C. §§ 1373, 1644, and Plaintiffs point to no evidence that the agency ever has responded to the sorts of requests Plaintiffs demand.[8] The most Plaintiffs offer is that federal law prohibits states and local jurisdictions from forbidding such requests, but that does not demonstrate that the PCQS is "available" to recorders. A.R.S. § 16-121.01(D).

---

[8] Plaintiffs cite letters submitted to DHS by election officials in two states that ask the agency to use PCQS to verify the citizenship status of a small number of applicants, but those letters do not show that DHS is able to respond to such inquiries on the scale Plaintiffs demand. *See* PI Mot. Exs. B, C. If anything, the letters support a finding that it is entirely *unclear* whether such information is available at all based on only a name and birthdate. *See* PI Mot. Ex. C at 3 (requesting "guidance" on how to format request).

And that may be for good reason: Even the agency documents regarding PCQS that Plaintiffs themselves rely upon suggest that providing limited information about an applicant in a PCQS search may result in "data" that is "not sufficient" to make a citizenship determination.[9] And DHS has repeatedly warned that "[t]here is a risk that PCQS may temporarily display inaccurate data due to inaccuracies in underlying source IT systems.".[10] For all these reasons, Plaintiffs are not likely to demonstrate that Defendants have violated A.R.S. § 16-121.01(D).

**Count II.** Plaintiffs also rely on A.R.S. § 16-121.01(D) for their second claim. PI Mot. at 20; FAC ¶¶ 170–75 (Count II). That provision further requires recorders to consult various databases to the extent they are accessible, including that "at a minimum" recorders must compare voter registration applicants who do not submit DPOC with DOT databases, SSA databases, SAVE "if practicable," NAPHSIS, and "[a]ny other . . . federal database" to which recorders have access. A.R.S. § 16-121.01(D). Plaintiffs' theory that DHS Requests are mandatory because they provide access to a "federal database" fails for all the reasons just described with respect to Count I: the law is applicable only during the registration process, and Plaintiffs have failed to show that DHS Requests for information from PCQS are an "available resource[]" for the recorders to "use." *Supra* Count I. But even if Plaintiffs were right on all of that, they have not shown that DHS Requests are a "database" at all. *E.g.*, *Wilderness World, Inc. v. Dep't of Revenue*, 182 Ariz. 196, 199 (Ariz. 1995) (en banc) ("[W]here general words follow the enumeration of particular classes of persons or things, the general words should be construed as applicable only to persons or things of the same general nature or class of those enumerated.") (citation omitted). While

---

[9] *Privacy Impact Assessment Update for the USCIS PCQS Supporting Immigration Status Verifiers* at 2, U.S. Dep't of Homeland Sec. (June 8, 2011), https://tinyurl.com/8c34jpad ("Privacy Impact Assessment").

[10] *Privacy Impact Assessment for PCQS* at 7, U.S. Dep't of Homeland Sec. (March 8, 2016), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-pcqs-march2016.pdf. This is in part because "PCQS is not the original point of collection for the information" and "depend[s] on the accuracy of the connected IT system information." *Id.* As an agency assessment cited in Plaintiffs' Complaint explains, *see* FAC ¶ 128–29 n.78, PCQS therefore sometimes produces "erroneous" data, which can be corrected only by other entities, Privacy Impact Assessment, *supra* note 9, at 8.

1  the enumerated databases *store* information, PCQS is merely a system for use by DHS

2  agents that populates based on various sources of information. *Supra* note 10.

3      **Count III.** Plaintiffs next point to A.R.S. § 16-165(K), which provides that recorders

4  must "to the extent practicable" review certain databases "to confirm information obtained

5  that requires cancellation of registrations." But this provision is only triggered upon the

6  recorder obtaining information that requires cancellation. *Id.* Plaintiffs wrongly assert that

7  failure to provide DPOC in and of itself constitutes such information, triggering DHS

8  requests. *See* PI Mot. at 21. Aside from failing for the reasons discussed with respect to

9  Counts I and II—including that DHS requests are not "practicable" for county election

10  officials to access—this argument also fails as a matter of basic statutory interpretation: The

11  provision expressly applies only when information has been obtained that would *itself* be

12  sufficient to require cancellation. A.R.S. § 16-165(K). Failure to provide DPOC is plainly

13  not such information. *See Richer*, 2024 WL 4299099, at \*2. To the contrary, such a theory

14  is irreconcilable with *ITCA* and contravenes the NVRA. *See* 570 U.S. at 20.[11]

15      **Count IV.** Finally, Plaintiffs separately claim that the Defendants are in violation of

16  A.R.S. § 16-143(A) because they have not provided lists of Federal-only voters and their

17  applications to the Attorney General. PI Mot. at 22. But Plaintiffs cite no evidence that

18  Defendants have failed to "make available to the attorney general" a list of Federal-only

19  voters, which is what the provision actually requires. A.R.S. § 16-143(A). And, as to the

20  purported requirement that applications must be submitted to the Attorney General "by

21  October 31, 2022," the provision is now moot and lacks force. That provision did not go

22  into effect until after that date, so no obligation to provide applications was ever triggered.

23  *See* Act of Mar. 30, 2022, 2022 Ariz. Legis. Serv. Ch. 99 (H.B. 2492); *see also* Act of Apr.

24  22, 2022, 2022 Ariz. Leg. Serv. Ch. 174 (S.B. 1638) (making H.B. 2492's effective date

25

---

26  [11] Plaintiffs also fail to identify any mandatory requirement in Section 16-165(K) that
Defendants have violated. The statute's use of the term "to the extent practicable" creates a

27  fundamentally "discretionary" function because it requires recorders to "balance competing
concerns." *Ariz. Minority Coal. for Fair Redist. v. Ariz. Indep. Redist. Comm'n*, 220 Ariz.

28  587, 597 (Ariz. 2009) (en banc). Plaintiffs fail to explain how the recorders' refusal to
submit the requests that Plaintiffs desire somehow violates or abuses that discretion.

1    Jan. 1, 2023). In any event, Plaintiffs' own evidence shows that the counties submitted this

2    information to the Attorney General through the Secretary of State in 2022, and the Attorney

3    General found no non-citizen voters were registered. PI Mot., Ex. G at 1, ECF No. 16-7.

4    **IV.    The equities tip sharply against Plaintiffs' requested injunction.**

5            Plaintiffs also fail to make a clear showing that they are likely "to suffer irreparable

6    harm in the absence of preliminary relief, that the balance of equities tips in [their] favor,

7    [or] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Indeed, Plaintiffs

8    have not clearly shown they will suffer *any* harm—much less the "extreme" harm necessary

9    for a mandatory injunction. *Marlyn Nutraceuticals*, 571 F.3d at 879. In contrast, Proposed

10   Intervenors, Defendants, and the public *will* suffer if the Court issues an injunction.[12]

11           Plaintiffs' claim of irreparable harm largely regurgitates their deficient standing

12   arguments, and Plaintiffs have again failed to substantiate these purported harms. *See supra*

13   § I.A. While they cite cases emphasizing that restrictions on the right to vote constitute

14   irreparable harm, PI Mot. at 22-23, Plaintiffs identify no restrictions they face to vote.

15   Plaintiffs and their members may cast their ballots in accordance with the law,

16   notwithstanding their efforts to deprive others of that same right. *Cf. Marchant v. N.Y.C.*

17   *Bd. of Elections*, 815 F. Supp. 2d 568, 578 (E.D.N.Y. 2011) (finding no irreparable harm

18   where right to vote was not actually at stake). Similarly, EZAZ.org's choice to spend

19   resources—purportedly in response to Arizona's list-maintenance policies—is not

20   irreparable harm. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (collecting

21   cases). Plaintiffs' failure to show irreparable harm "is fatal to [their] motion." *Corbin v.*

22   *Ryan*, No. CV 09-2677-PHX-JAT, 2010 WL 3327717, at *2 (D. Ariz. Aug. 24, 2010).

23           Moreover, Plaintiffs' delay in filing suit and an emergency motion just as voting

24   began in Arizona weighs heavily against granting relief. "[A] party requesting a preliminary

25   injunction must generally show reasonable diligence" "in election law cases as elsewhere."

26   *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). Plaintiffs delayed in bringing this litigation

27

28   ---
     [12] The balance of harms and the public interest "merge where a government agency is a
     party." *Assurance Wireless USA v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024).

on the cusp of the NVRA's 90-day quiet period and then filed an amended complaint a month later—just two months from election day and well into the NVRA quiet period. They then waited another two weeks to file this emergency motion. Plaintiffs offer no excuse for their tardiness, which further undercuts their request for extraordinary relief. *See* 11A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. § 2948.1 (3d ed. 2024).

Plaintiffs spill little ink addressing the balance of harms and public interest at stake. PI Mot. at 24-25. For good reason: Plaintiffs' request to establish a novel systematic removal program after voting has commenced in Arizona would sow chaos and confusion, harming Proposed Intervenors, Defendants, and the public at large. As the Arizona Supreme Court recognized more than a week ago, there is simply "too little time remaining" to alter the registration status of Arizona voters this year. *Richer*, 2024 WL 4299099, at *3.

Plaintiffs' requested relief poses a very serious risk of disenfranchising lawful voters—including Proposed Intervenors' members and constituents. *See Arcia*, 772 F.3d at 1346 (explaining that "systematic removal programs" are prohibited in "the 90 days before an election because that is when the risk of dis[en]franchising eligible voters is the greatest"); *Mi Familia Vota*, 691 F. Supp. at 1093 (similar). That is precisely *why* Congress has banned sweeping removal efforts when an election is imminent. *See supra* § II. Such last-minute removals threaten the important public interest in ensuring citizens can cast their ballots. *E.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012) (explaining that public interest lies in "permitting as many qualified voters to vote as possible"). And Proposed Intervenors are at a particular risk of harm because they represent constituencies who face an acute risk from systematic investigations and purges based on a lack of DPOC. *See* Mot. to Intervene, Ex. B ¶¶ 8–13, ECF No. 5-2 (Patel Decl.); Mot. to Intervene, Ex. C ¶¶ 9–12, ECF No. 5-3 (Bock Decl.).

## **CONCLUSION**

The Court should deny Plaintiffs' motion for a preliminary injunction.

RESPECTFULLY SUBMITTED this 30th day of September, 2024.

**COPPERSMITH BROCKELMAN PLC**

By: */s/ D. Andrew Gaona*
    D. Andrew Gaona
    Austin C. Yost

**ELIAS LAW GROUP LLP**

    Lalitha D. Madduri*
    Christopher D. Dodge*
    Tyler L. Bishop*
    Renata M. O'Donnell*

*Attorneys for Proposed Intervenor-Defendants*
*Voto Latino and One Arizona*

**Admitted Pro Hac Vice*