**AMERICA FIRST LEGAL FOUNDATION**

James K. Rogers (No. 027287)
    *Senior Counsel*
611 Pennsylvania Ave., SE #231
Washington, D.C. 20003
Phone: (202) 964-3721
James.Rogers@aflegal.org

**JENNIFER WRIGHT ESQ., PLC**

Jennifer J. Wright (No. 027145)
4350 E. Indian School Rd
Suite #21-105
Phoenix, Arizona 85018
jen@jenwesq.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Strong Communities Foundation of Arizona Incorporated, and Yvonne Cahill;<br><br>          Plaintiffs,<br>     v.<br><br>Stephen Richer, in his official capacity as Maricopa County Recorder; *et al.*<br><br>Defendants. | No. CV-24-02030-PHX-SMB<br><br>**THE PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

# Table of Contents

I.    The Plaintiffs have standing...................................................................................... 1

    A.    EZAZ.org has organizational standing. ......................................................... 1

    B.    EZAZ.org has representational standing. ...................................................... 3

    C.    The Plaintiffs have plausibly alleged that foreigners are registering. ................... 3

    D.    The Plaintiffs' claims are redressable. .......................................................... 5

II.    The Plaintiffs sent the required NVRA notice letter. ...................................... 6

III.    The Plaintiffs' claims are timely................................................................... 9

IV.    *Purcell* is inapplicable here. ......................................................................... 10

V.    The Plaintiffs are likely to succeed on the merits. ........................................ 13

    A.    DHS is required by law to answer all inquiries submitted by the Defendants—with or without an alien number included—and federal agencies are presumed to follow the law. ..... 13

    B.    DHS can access information about the immigration status of individuals without an alien number............................................................................................... 13

        1.    PCQS.................................................................................................. 13

        2.    LESC / ACRIMe.................................................................................. 14

    C.    The information available through 1373/1644 Requests qualifies as a "database." ...... 15

    D.    List maintenance that includes SAVE checks and not 1373/1644 Requests violates the NVRA's uniformity and nondiscrimination requirements........................................ 18

VI.    The Plaintiffs will suffer irreparable harm. ................................................. 18

VII.    The balance of hardships favors the Plaintiffs. ........................................... 18

VIII.    Proposed-Intervenor DNC's Eleventh and Fourteenth Amendment claims are inapplicable ................................................................................................ 19

# TABLE OF AUTHORITIES

Page(s)

## US SUPREME COURT CASES

*Arizona v. United States*, 567 U.S. 387 (2012) ................................................................. 14

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) ................................................. 15

*F.C.C. v. Schreiber*, 381 U.S. 279 (1965) ........................................................................... 6

*Food & Drug Admin. v. All. for Hippocratic Medicine (("Hippocratic Medicine")*, 602 U.S. 367 (2024) ............................................................................................................................ 1

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .................................................................. 5

*Merrill v. Milligan*, 142 S.Ct. 879, 881 (2022) ........................................................... 11, 12

*NLRB v. Noel Canning*, 573 U.S. 513 (2014) .................................................................... 10

*Parklane Hosiery Co.*, 439 U.S. 322 (1979) ....................................................................... 5

*Purcell v. Gonzalez*, 127 S.Ct. 5 (2006) ........................................................................... 10

## CASES

*Am. C.R. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779 (W.D. Tex. 2015) ..................... 7

*Am. C.R. Union v. Philadelphia City Commissioners*, 2016 WL 4721118 (E.D. Pa. Sept. 9, 2016)…………………………………………………………………………………………………………7

*Ass'n of Cmty. Organizations for Reform Now v. Miller*, 912 F. Supp. 976 (W.D. Mich. 1995) ........ 9

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019) .............................................................. 7

*Bonyer v. Ducey*, 506 F.Supp. 3d 699 (D. Ariz. 2020) ...................................................... 19

*City & Cnty. of San Francisco v. United States Citizenship & Immigr. Servs.*, 944 F.3d 773 (9th Cir. 2019) ....................................................................................................................... 1

*Ctr. for Biological Diversity v. Bernhardt*, 592 F. Supp. 3d 845 (D. Ariz. 2022) ............... 5

*Embury v. King*, 361 F. 3d 562 (9th Cir. 2004) ................................................................. 19

ii

*Enriquez-Perdomo v. Newman*, 54 F.4th 855 (6th Cir. 2022) ............................................. 16

*Garza v. Cnty. of Los Angeles*, 918 F.2d 763 (9th Cir. 1990) ........................................... 9

*Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788 (9th Cir. 2020) ...................... 16

*In re Hergenroeder*, 555 F.2d 686 (9th Cir. 1977) ...................................................... 6

*Jackson v. Abercrombie*, 884 F.Supp.2d 1065 (D. Hawaii, 2012) ......................................... 19

*Jud. Watch, Inc. v. United States Dep't of Homeland Sec.*, 59 F. Supp. 3d 184 (D.D.C. 2014) ........ 17

*Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020) .............................................. 5

*Lake v. Hobbs*, 623 F.Supp.3d 1015 (D. Ariz. 2022) ................................................... 11

*Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088 (E.D. Cal. 2018) ........................................ 9

*M.S. v. Brown*, 902 F.3d 1076 (9th Cir. 2018) ......................................................... 5

*Mendoza v. United States Immigr. & Customs Enf't*, 849 F.3d 408 (8th Cir. 2017) ...................... 15

*Mi Familia Vota v. Fontes*, 2024 WL 862406 (D. Ariz. Feb. 29, 2024)………………………….3

*N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152 (9th Cir.1988) ............................................ 6

*Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015) ................................. 3

*Oyeniran v. Holder*, 672 F.3d 800 (9th Cir. 2012) .................................................... 4

*Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069 (9th Cir. 2010) .............................. 5, 13

*Shulman v. Kaplan*, 58 F.4th 404 (9th Cir. 2023) ...................................................... 5

*Treez, Inc. v. United States Dep't of Homeland Sec.*, No. 22-CV-07027-RS (TSH), 2024 WL 4312233 (N.D. Cal. Sept. 26, 2024) .................................................................. 16

*United States v. Farias-Gonzalez*, 556 F.3d 1181 (11th Cir. 2009) .................................... 14

*United States v. Meza-Gonzalez*, 2018 WL 3752780 (S.D. Cal. Aug. 7, 2018) ............................ 17

*United States v. Meza-Gonzalez*, No. 517CR008211OLG, 2018 WL 1792171 (W.D. Tex. Apr. 16, 2018) ...................................................................................... 14

*United States v. Perez*, 2021 WL 2019205 (W.D. Va. May 20, 2021) .................................... 17

*United States v. Perez-Hernandez*, No. CR 18-3752 KG, 2019 WL 2176313 (D.N.M. May 20, 2019) ........................................................................................................................................ 17

*United States v. Robles-Velasco*, 2024 WL 3259569 (C.D. Cal. July 1, 2024) ................................. 17

*United States v. Vasquez-Ortiz*, 2008 WL 11449053 (N.D. Ga. June 13, 2008) ........................... 15

*Voter Intergrity Project NC, Inc. v. Wake Cnty. Bd. of Elections (hereinafter "Voter Integrity")*, 301 F. Supp. 3d 612 (E.D.N.C. 2017) .............................................................................................. 6, 7

*WildEarth Guardians v. Conner*, 920 F.3d 1245 (10th Cir. 2019) ..................................................... 6

**STATE CASES**

*Arizona Pub. Integrity All. v. Fontes*, 250 Ariz. 58 (2020) ............................................................... 10

*Planned Parenthood Arizona, Inc. v. Mayes*, 257 Ariz. 110 (2024) ................................................. 15

*Richer v. Fontes*, No. CV-24-0221-SA, 2024 WL 4299099 (Ariz. Sept. 20, 2024) .................... 11

**FEDERAL STATUTES**

8 U.S.C. § 1373 ............................................................................................................................. 6, 14, 16

8 U.S.C. § 1644 ...................................................................................................................................... 16

52 U.S.C. § 20501 .................................................................................................................................... 7

52 U.S.C. § 20507 .............................................................................................................................. 10, 18

52 U.S.C. § 20510 ................................................................................................................................. 7, 8

**STATE STATUTES**

A.R.S. 16-121.01 ............................................................................................................................... 11, 15

A.R.S. 16-143 ....................................................................................................................... 6, 11, 12

A.R.S. 16-165 ........................................................................................................... 6, 10, 11, 15

A.R.S. 1-213 ......................................................................................................................................... 16

## OTHER AUTHORITIES

*Arizona Voter Data Coding Oversight Updated*, AZSOS, (Sep. 30, 2024),
https://perma.cc/N6NF-SED6. ........................................................................... 4

Emergency Petition for Special Action, *Richer v. Fontes*, CV-24-0221 (Ariz. Sup. Ct.) (Sept.
17, 2024), https://perma.cc/22AZ-LH2K....................................................4, 12

Joint Stipulation of Facts, *Richer v. Fontes*, CV-24-0221 (Ariz. Sup. Ct.) (Sept. 18, 2024). ¶¶
14-15. https://perma.cc/27GQ-NWGZ............................................................... 4

*Privacy Impact Assessment for Alien Criminal Response Information Management System (ACRIMe)*,
U.S. Dep't of Homeland Security at 1, (Apr. 22. 2010), https://perma.cc/GVF7-
2N6L ............................................................................................................... 14

## I.    The Plaintiffs have standing.

"At this very preliminary stage" in which the Plaintiffs are seeking a Temporary Restraining Order and Preliminary Injunction, they "may rely on the allegations in their Complaint and whatever other evidence they submitted in support of their preliminary-injunction motion to meet their burden," "[a]nd they need only establish a risk or threat of injury to satisfy the actual injury requirement." *City & Cnty. of San Francisco v. United States Citizenship & Immigr. Servs.*, 944 F.3d 773, 787 (9th Cir. 2019) (cleaned up).

Under that standard, the Plaintiffs have demonstrated that they have standing.

### A.    EZAZ.org has organizational standing.

The Defendants' failure to conduct statutorily required list maintenance directly harms EZAZ.org's *already-existing* core activities. *See, e.g., Ariz. All. for Retired Americans v. Mayes*, --- F.4th ---, 2024 WL 4246721, at *8 (9th Cir. Sept. 20, 2024) ("*AARA*").

In *AARA*, the Ninth Circuit clarified that the organizational standing requirement under *Food & Drug Admin. v. All. for Hippocratic Medicine* (("*Hippocratic Medicine*") 602 U.S. 367 (2024)) requires the organization to "show that a challenged governmental action directly injures the organization's pre-existing core activities and does so *apart* from the plaintiffs' response to that governmental action." *AARA*, at *2. The Plaintiffs did just that.

Specifically, as delineated in Plaintiffs' TRO/PI Motion, an already existing core activity for EZAZ.org is conducting voter outreach. Doc. 57, at 18 and Ex. A, ¶ 12. The Defendants' failure to remove ineligible voters causes the organization to expend resources not only to reach out to ineligible voters but also to notify the counties to initiate cancellation procedures. *Id.*, Ex. A., ¶ ¶ 12, 13. Further, part of EZAZ.org's core activities is conducting voter education to make civic action "as easy as pie." *Id.* Ex. A., ¶ 9. However, because of increasing concerns among voters about foreign citizens voting, a considerable amount of resources for voter education is now being diverted to responding to these issues caused not only by the Defendants' failure to conduct, but also their vocal opposition to conducting, their statutory duties of investigating Federal-Only voters and removing foreign citizens from voter rolls. *Id.* Ex. A, ¶ 15.

1

The Plaintiffs detailed six different ways in which EZAZ.org is suffering concrete and particularized harms and how the Defendants' failure to act in accordance with the law directly impacts EZAZ.org's ability to carry out its existing core activities. *Id.* at 18-19. *All* of those harms are to EZAZ.org's pre-existing activities, and the Defendants never explain how it could be otherwise.

Rather, the Defendants[1] make the bare and unsupported assertion that EZAZ.org has been "expending resources in response to the list maintenance practices regarding Federal-Only Voters." ECF No. 48 at 4. However, the Defendants never even attempt actually to quote from or directly refute the actual standing evidence presented in the TRO/PI Motion. They do not because they cannot. The Plaintiffs' evidence clearly demonstrates that the Defendants' conduct has harmed EZAZ.org's pre-existing core activities.

For example, the Defendants never dispute EZAZ.org's allegation that its personnel conduct door-knocking campaigns and voter education efforts *apart* from anything to do with voter list maintenance and that the Defendants' conduct as outlined in the FAC harm those pre-existing door-knocking and voter education efforts. (*See* ECF No. 57 at 18:10-18:26; i*d.* at 39-40, Ex. A ¶¶ 12-15.) Nor do the Defendants attempt to refute EZAZ.org's allegations that its failure to engage in proper voter list maintenance has harmed EZAZ.org's ability to recruit volunteers. (*See id.* at 18:16-19:3; i*d.* at 40, Ex. A ¶ 16.) Nor do the Defendants attempt to refute EZAZ.org's contention that, since its founding in 2018, it has been deeply engaged in the issue of Federal-Only Voters, that this engagement has always included outreach to, and education of, State legislators about the topic, and that the Defendants failure to conduct proper list maintenance has forced EZAZ.org to expend additional resources engaging in this pre-existing organizational focus. (*See id.* at 19:3-19:9; i*d.* at 40, Ex. A ¶¶ 17-19.) Nor do the Defendants attempt to refute EZAZ.org's contention that the Defendants' failure to conduct proper list maintenance recently has caused the number of Federal-Only Voters to increase

---

[1] As it relates to arguments made by "Defendants" - Plaintiffs note that although Maricopa County advanced the arguments, all but Greenlee and Mohave County joined in Maricopa County's arguments. Accordingly, for simplicity, "Defendants" (as it relates to arguments in the Response) refer to Maricopa County and the twelve counties that joined in the response.

at unprecedented rates, which has required EZAZ.org to devote additional resources to monitoring this issue or pre-existing focus. (*See id.* at 19:9-19:19; *id.* at 40-41, Ex. A ¶¶ 20-21.) Nor do the Defendants attempt to refute that their failures to conduct proper list maintenance has caused EZAZ.org to expend additional resources in its pre-existing mission of encouraging discouraged eligible voters to cast a ballot. (*See id.* at 19:19-19:23; *id.* at 39, Ex. A ¶¶ 12-13.)

EZAZ.org, therefore, satisfies the requirements for standing articulated in *Hippocratic Medicine* as clarified in *AARA*.

**B.    EZAZ.org has representational standing.**

EZAZ.org also has representational standing. A substantial number of members are spread throughout the State of Arizona. ECF No. 57, Ex. A ¶¶ 8-11. The Defendants never refuted the Plaintiffs' argument that there was a clear "risk that one or more of [EZAZ.org's members] will be subject to enforcement by Defendants" (*Id.* at 17-18), which are engaging in the non-uniform and discriminatory practice of submitting to DHS verification requests about the immigration status of Federal-Only Voters who have an alien number, but not for other Federal-Only Voters who lack one (who would be either natural born citizens or unlawfully present aliens). "[T]o demonstrate representational standing, an organization is not required to identify of any member who is or will be injured 'where it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action.'" *Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 862406, at *32 (D. Ariz. Feb. 29, 2024) (quoting *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015)) (cleaned up).

**C.    The Plaintiffs have plausibly alleged that foreigners are registering.**

While the Plaintiffs' Motion has been pending, definitive evidence has emerged that foreign citizens *are* registered to vote in Arizona and that their presence on the voter rolls is because of the improper list maintenance actions of public officials in the State.

The Defendants' contention that it is conjectural that there are foreign citizens registered to vote is particularly puzzling, as Maricopa County Recorder Stephen Richer ("Recorder Richer") himself recently admitted exactly the opposite in court. Specifically, on September 17, 2024, Recorder Richer filed an Emergency Petition for Special Action in the Arizona Supreme Court seeking an order forcing that the voter registration of tens of thousands of individuals be switched from being listed as full-ballot voters to Federal-Only Voters. Emergency Petition for Special Action, *Richer v. Fontes*, CV-24-0221 (Ariz. Sup. Ct.) (Sept. 17, 2024), https://perma.cc/22AZ-LH2K. As part of that Special Action, Recorder Richer submitted together with Arizona Secretary of State Adrian Fontes ("Secretary Fontes") a Joint Stipulation of Facts ("JSOF") admitting that on about September 6, 2024, Recorder Richer had identified a flaw in the system that had allowed tens of thousands of individuals to register to vote even though they had not provided proof of citizenship. JSOF, *Richer v. Fontes*, CV-24-0221 (Ariz. Sup. Ct.) (Sept. 18, 2024). ¶¶ 14-15. https://perma.cc/27GQ-NWGZ.

More importantly, Recorder Richer admits in the JSOF that the flaw was discovered when his office identified an individual registered to vote as a full-ballot voter even though that individual "is not a United States citizen." *Id.* Secretary Fontes has since admitted that this failure allowed over 218,000 individuals to register to vote without providing documentary proof of citizenship, as required by law. *Arizona Voter Data Coding Oversight Updated*, AZSOS, (Sep. 30, 2024), https://perma.cc/N6NF-SED6.

Recorder Richer has, therefore, already admitted in another proceeding that at least one foreign citizen had been registered for years without being detected. Issue preclusion, or "collateral estoppel applies to a question, issue, or fact when four conditions are met: (1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Oyeniran v. Holder*, 672 F.3d 800, 806 (9th Cir. 2012). All four conditoins are met here.

For issue preclusion to apply when there is not mutuality between the parties in the prior and current actions, the party seeking non-mutual issue preclusion must also show that its application would not be unfair. *Parklane Hosiery Co.*, 439 U.S. 322, 330–331(1979). There is no unfairness here because Recorder Richer affirmatively admitted to this fact.

Recorder Richer, therefore, is precluded from arguing here that foreign citizens are not registered to vote in Arizona.

Furthermore, the Plaintiffs cited polling data showing that just over three percent of likely Arizona voters disclaimed U.S. citizenship. ECF. No. 57 at 1, 7. This data went completely unrebutted by the Defendants.

### D. The Plaintiffs' claims are redressable.

In the redressability inquiry, courts "assume that the plaintiff's claim has legal merit." *Shulman v. Kaplan*, 58 F.4th 404, 409 (9th Cir. 2023) (quoting *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018)) (cleaned up). "Redress need not be guaranteed," so long as it is not "merely speculative." *Ctr. for Biological Diversity v. Bernhardt*, 592 F. Supp. 3d 845, 854 (D. Ariz. 2022) (quoting *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020))

The Defendants claim that the Plaintiffs' claims are not redressable because, in their view, the Plaintiffs' claimed relief depends on the actions of third parties: DHS and the Arizona Attorney General.

However, relief that relies on the actions of third parties only causes a redressability problem if that relief depends on the "*unfettered* choices made by independent actors not before the courts." *Ctr. for Biological Diversity v. Bernhardt*, 592 F. Supp. 3d 845, 855 (D. Ariz. 2022) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)) (emphasis added). Here, the discretion of both DHS and the Arizona Attorney General is not "unfettered." Indeed, it is carefully circumscribed by *mandatory* duties imposed by statute.

The Defendants essentially ask this Court to assume that DHS and the Arizona Attorney General will disobey mandatory commands of federal statutes. But, this Court is required to presume the *opposite*. Under binding Ninth Circuit precedent, courts "presume that agencies will follow the law." *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1082 (9th Cir.

2010) (citing *N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir.1988)); *see also*, *F.C.C. v. Schreiber*, 381 U.S. 279, 296 (1965) (acknowledging "the presumption ...that [administrative agencies] will act properly and according to law"); *In re Hergenroeder*, 555 F.2d 686, 686 (9th Cir. 1977) (acknowledging "the presumption that the government obeys the law"); *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1261 (10th Cir. 2019) ("We generally presume that government agencies comply with the law...." (citing *N. Cheyenne Tribe v. Hodel*, 851 F.2d at 1157)

Here, the relevant federal statutes impose an absolute mandatory obligation on DHS that is not limited to inquiries only submitted through SAVE or that contain an alien number: DHS "*shall* respond to an inquiry" about "*any* individual within the jurisdiction of the agency." 8 U.S.C. § 1373(c) (emphasis added). DHS *must* respond to inquiries about *any* individual—not just individuals possessing an alien number.

Similarly, Arizona law requires that "[t]he attorney general *shall* use all available resources to verify the citizenship status of the applicant." A.R.S. § 16-143(B).

## II.     The Plaintiffs sent the required NVRA notice letter.

Arizona law specifically delineates that c*ounty recorders* have responsibility for performing list maintenance functions necessitated by the NVRA's requirement that election officials remove ineligible voters. *See* A.R.S. 16-165(A), (B), (C), (H), (I), (J), (K), (L). Further, where the Secretary of State has been specifically tasked with obtaining bulk information, the information is forwarded to the recorders for processing. *See* A.R.S. 16-165 (D), (E), (F), (G). Critically, all of the provisions at issue here relate specifically to the Defendant counties' statutory responsibilities. ECF No. 57, 4-5 (alleging violations of A.R.S. 16-165(I), (H), (J), (K), as well as 16-121.01(D), requiring the County Recorder (not Secretary of State) to consult a variety of databases). Where election officials other than state officials have been statutorily tasked with specific list maintenance functions, county and local officials have been found to be the proper party in an NVRA suit and the proper party to whom the NVRA notice letter should be sent. *See, i.e.*, *Voter Intergrity Project NC, Inc. v. Wake Cnty. Bd. of Elections* (hereinafter "*Voter Integrity*"), 301 F. Supp. 3d 612, 615–18 (E.D.N.C. 2017) (holding that county was the proper party in the NVRA suit and that the notice letter sent to county officials satisfied the

NVRA pre-suit notice requirement); *see also Am. C.R. Union v. Philadelphia City Commissioners*, No. CV 16-1507, 2016 WL 4721118, at *4 (E.D. Pa. Sept. 9, 2016), aff'd, 872 F.3d 175 (3d Cir. 2017) (holding that NVRA notice letter sent to city election officials was sufficient under the requirements of the NVRA)

The Defendants are incorrect to argue that an NVRA notice letter must be sent to the Secretary of State. In *Voter Integrity,* the plaintiff sued the Wake County Board of Elections (WCBOE), alleging violations of the NVRA. WCBOE argued that it was not a proper party to the case and that the NVRA notice letter it had received was defective because North Carolina state law charged the North Carolina State Board of Elections, and not the WCBOE, with "adopting a program to comply with the NVRA's list maintenance requirement" similar to Arizona's designation of the Secretary of State as the "chief elections officer." 301 F.Supp. 3d at 615. However, the court found that because the county board of elections had "explicit list maintenance obligations" and because the NVRA also contemplates local government involvement in carrying out the State's obligations (*see* 52 U.S.C. 20501(a)(2)), the county was a proper party and that the notice letter sent to it by the plaintiffs fulfilled the NVRA's notice requirements. *See also Bellitto v. Snipes*, 935 F.3d 1192, 1196 (11th Cir. 2019) (describing with approval plaintiffs' transmission of NVRA notice letter related to violations by county to county official in charge of election); *see also Am. C.R. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 794–95 (W.D. Tex. 2015) (holding that letter to county tax assessor-collector complied with NVRA's notice requirements).

Furthermore, there was nothing defective about the form of the Plaintiffs' letter to the Defendants. NVRA letters sent pursuant to 52 U.S.C. § 20510 do not need to specifically invoke the NVRA or identify precisely how the specified conduct violates the NVRA, so long as the letter identifies specific wrongful conduct. The statutory language of 52 U.S.C. § 20510(b)(1) provides that "a person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved." The statute's plain language only requires notification of the violation that is occurring. It does

not require that the notice detail the exact nature of how that conduct violates the NVRA. In other words, the NVRA only requires a notice of the specific conduct that is objectionable, not a legal analysis of how that conduct violates the NVRA. This interpretation of the NVRA's notice provision makes sense, as its overarching purpose is to allow the alleged violator an opportunity to correct the issue, which can be effectively communicated without detailed legal citations to the NVRA's requirements.

Similarly, the NVRA only requires "written notice of a violation," not a detailed analysis of the NVRA's requirements or a statement of the specific claims that a plaintiff plans to assert if the violation is not remedied. The violation at issue in this case is the Defendants' failure to submit 1373/1644 Requests. The letters to the Defendants invoked the NVRA and provided notice to the Defendants of their unlawful failure to submit 1373/1644 Requests. That is sufficient under the NVRA's notice requirements.

The Plaintiffs were unable to find any cases that impose a specificity requirement of the type that the Defendants demand here. Most tellingly, the Defendants failed to cite a single case to support the specificity requirement that they attempt to read into the NVRA.

Assuming, *arguendo*, that specific language in an NVRA notice letter is required, any such omission in the Plaintiffs' letter is harmless error because there are now fewer than 30 days before the election. The NVRA does not require pre-suit notice if a "violation occurred within 30 days before the date of an election for Federal office." 52 U.S.C. § 20510(b)(3). The violations alleged in the FAC are ongoing and continue to the present moment. Thus, if this case were dismissed because of a failure to conform to the NVRA's notice requirements, the Plaintiffs could refile their case that same day and avoid the notice requirement entirely. It, therefore, would be nonsensical and a waste of both judicial and litigant resources to deny relief to the Plaintiffs because of any perceived defect in their letters to the Defendants.

Finally, Cahill's failure to send her own NVRA letter is irrelevant. Where one plaintiff has already sent a notice that was ignored, other "plaintiffs are not barred for failing to file

notice." *Ass'n of Cmty. Organizations for Reform Now v. Miller*, 912 F. Supp. 976, 983 (W.D. Mich. 1995), aff'd, 129 F.3d 833 (6th Cir. 1997).

**III.    The Plaintiffs' claims are timely.**

The Plaintiffs' claims are timely, and laches is not available to the Defendants here. In cases involving elections, the Ninth Circuit has held that laches did not apply even when the Plaintiffs had waited many years to seek relief. In *Garza v. Cnty. of Los Angeles*, the county defendant argued that "the plaintiffs' claim for redistricting relief [was] barred on the ground of laches" because it would cause "substantial hardship" to the county and because "the plaintiffs had no excuse for their delay in bringing suit." 918 F.2d 763, 772 (9th Cir. 1990). The Ninth Circuit rejected this argument "[b]ecause of the ongoing nature of the violation" and because the problem "ha[d] been getting progressively worse." *Id.*; *see also Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1143–44 (E.D. Cal. 2018) (applying *Garza* and holding that laches did not apply to action challenging redistricting plan even though it had been adopted five years earlier because the problem was ongoing and had been getting worse).

Just so here. The violation alleged by the Plaintiffs is ongoing and has been getting worse, especially in recent months. The timing of this lawsuit makes perfect sense in that context. Indeed, the FAC specifically calls attention to the fact that number of Federal-Only Voters has only recently started increasing at an alarming rate. ECF No. 12 at 13 ¶¶ 62-67. In the TRO/PI Motion, EZAZ.org specifically explained that "[t]he unprecedently rapid rate of increase in the number of Federal-Only Voters this year" has caused it great concern and that "[i]f the registration rates of Federal-Only Voters had not started increasing this year at such unprecedented rates, then there would be less cause for concern, and EZAZ.org would not be forced to expend as much time and money on monitoring the situation." ECF No. 57 at 40-41 (Ex. A) ¶ 21.)

The Defendants' laches argument is particularly inappropriate here because, at its essence, they are arguing that the Defendants should be free to violate the law with impunity, so long as they can manage to get away with it long enough. The Defendants are trying to twist the doctrine of laches into a new kind of adverse possession for unlawful executive

practices. This is wholly inappropriate. As the Arizona Supreme Court has explained, "Plaintiffs' delay does not excuse the County from its duty to comply with the law." *Arizona Pub. Integrity All. v. Fontes*, 250 Ariz. 58, 65 ¶ 30 (2020). And as Justice Scalia has pointed out, there is no "adverse-possession theory of executive authority," *NLRB v. Noel Canning*, 573 U.S. 513, 570 (2014) (Scalia, J., concurring in the judgment).

Nor is there any substance to the Defendants' argument that the timing of this suit would violate the NVRA's restriction that prohibits within 90 days of an election "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). The relief sought in this case is merely the sending of a letter to DHS and not the removal of *any* voters. If any voters end up being removed from voter rolls after DHS has responded to the 1373/1644 Requests from the Defendants, it would only be in response to an individualized investigation prompted by that response, not by any systematic removal. Furthermore, no names could even be removed before the election (and while the NVRA's 90-day blackout period is in effect) because there are fewer than 35 days before the election, and Arizona law imposes a 35-day cure period before any voter can be removed from voter rolls for lack of citizenship. A.R.S. § 16-165(A)(10).

## IV.   *Purcell* is inapplicable here.

The *Purcell* doctrine does not foreclose relief here. The Defendants extend the *Purcell* doctrine too far. The primary purpose of the *Purcell* doctrine is to prevent "voter confusion" by changing election procedures, laws, or rules with which voters must comply to vote. *Purcell v. Gonzalez*, 127 S.Ct. 5, 7 (2006). Here, the Plaintiffs' requested relief would not and cannot cause voter confusion, as, based on existing law, every voter registration record that lacks DPOC should already be compared against federal databases to confirm the registrant's citizenship status. The Defendants' compliance with existing law cannot reasonably cause voter confusion.

The *Purcell* doctrine's secondary purpose is to prevent last-minute "administrative burdens for election officials." *Lake v. Hobbs*, 623 F.Supp.3d 1015, 1031 (D. Ariz. 2022). However, in *Merrill v. Milligan*, Justice Kavanagh's concurring opinion suggested that the administrative burdens are tempered where "the changes in question are at least feasible before the election without significant cost, confusion, or hardship." 142 S.Ct. 879, 881 (2022) (Kavanaugh, J., concurring).

To the extent that the Plaintiffs' requested relief constitutes a "change" to existing county procedures, the relief is not only feasible, it comes at little cost to the Defendants. In fact, this protracted litigation has expended far more time and resources than would have been expended if the Defendants had simply complied with the Plaintiffs' reasonable request. Specifically, Plaintiffs relief is limited to an order requiring the Defendants to (1) "submit 1373/1644 Requests to DHS" and (2) "'make available' and 'provide' to the Arizona Attorney General the information about Federal-Only Voters required by A.R.S. § 16-143." ECF No. 57 at 26.

Despite the hyperbolic claims of the Defendants and the Proposed-Intervenors, nowhere in the Plaintiffs' requested relief is there any demand that the Defendants initiate mass purges of voters. Instead, the Plaintiffs seek to have the Defendants make an inquiry to DHS to investigate the citizenship status of the Federal-Only voters. The Plaintiffs' requested relief says nothing about how counties should respond to information received from DHS. Instead, the Plaintiffs presume that the Defendants will follow state and federal law to conduct an individualized review of all returned records, and once satisfied with those findings, they will move confirmed citizens to the list of "full-ballot" voters in compliance with A.R.S. § 16-121.01(E) and initiate cancellation procedures of foreign citizens as delineated in A.R.S. § 16-165(A)(10) and in compliance with the NVRA.

Maricopa County's comparison of this case to *Richer v. Fontes,* No. CV-24-0221-SA, 2024 WL 4299099 (Ariz. Sept. 20, 2024), is inapposite. (*See* ECF No. 48 at 11-12.) In *Richer v.*

*Fontes*, Recorder Richer argued that 98,000 voters who had been erroneously marked as having provided DPOC should "only cast a Federal Only ballot unless and until the voter presents DPOC." Emergency Petition for Special Action at 1-3, *Richer v. Fontes*, CV-24-0221 (Ariz. Sup. Ct.) (Sept. 17, 2024), https://perma.cc/22AZ-LH2K. Essentially, Recorder Richer argued that the State should systematically strip 98,000 voters of their right to participate in state and local races just four days before the UOCAVA ballots were to be mailed out. *Id.*

In its order, the Arizona Supreme Court rejected Recorder Richer's argument and further noted that "subsection (A)(10) recognizes the right of any voter to notice and an opportunity to contest any determination of a voter's ineligibility" and that a "county recorder can therefore proceed with respect to individual voters under § 16-165(A)(10) as long as the provision's due process requirements are followed." *Richer*, at 3. To the extent that returned records from DHS suggest a registered voter is a foreign citizen, the Plaintiffs expect that the Defendants would provide the exact due process the Arizona Supreme Court affirmed was lawfully available to remove foreign citizens from the voter registration records.

Specifically, the Plaintiffs' requested relief is limited to the Defendants writing a letter to DHS inquiring about the citizenship status of Federal-Only Voters, modeled after Florida (which provided a target list of voters with the inquiry) or South Carolina (which asked for "guidance on the best format in which to provide [DHS] with the lists"). Doc. 57, Ex B & C. As to the second issue, the only relief requested is that the Defendants "make available to the [Arizona] attorney general a list of all individuals" who are Federal-Only Voters and also "provide" to her "the applications of individuals who are" Federal-Only Voters, A.R.S. § 16-143(A), by transmitting this information to the Arizona Attorney General. ECF No. 57 at 26. Both prayers for relief are "at least feasible before the election without significant cost, confusion, or hardship." *Merrill*, 142 S.Ct. at 881.

**V.     The Plaintiffs are likely to succeed on the merits.**

      **A.     DHS is required by law to answer all inquiries submitted by the Defendants—with or without an alien number included—and federal agencies are presumed to follow the law.**

The relief that the Plaintiffs seek is very narrow and is required by the NVRA and Arizona law. Specifically, the Plaintiffs only seek an order requiring the Defendants to conduct proper uniform and non-discriminatory list maintenance by making inquiries about the citizenship of *all* Federal-Only Voters, rather than for just a subset of them, as they currently do. Nothing in the relief requested includes anything more than beginning the investigation process. The Plaintiffs presume that if DHS reports that some Federal-Only Voters are foreign citizens, the Defendants will proceed in compliance with State and federal law, including proper notice and due process to affected individuals, before canceling any voter registrations.

The Defendants make much of their claims about whether DHS's Person Centric Querry System (PCQS) database can provide information about individuals without an alien number. As explained below, the Defendants are wrong on the facts, but its error is irrelevant. The Defendants' focus on PCQS is a red herring. As explained above in section I.D., courts in the Ninth Circuit must "presume that agencies will follow the law." *Pit River Tribe*, 615 F.3d at 1082 (citation omitted). The Defendants never dispute that Sections 1373 and 1644 require DHS to respond to inquiries from state and local governments about the immigration status of *any* individual. *How* DHS obtains its information, therefore, is irrelevant to this Court's inquiry. This Court *must* assume that DHS will answer such inquiries because federal law requires it.

      **B.     DHS can access information about the immigration status of individuals without an alien number.**

            **1.     PCQS**

Even if this Court chooses to delve into the details of what information is available through DHS's databases, the Defendants still lose the argument. The Defendants' own Exhibit 3 (which is DHS's 2016 Privacy Impact Statement about PCQS) contradicts their argument and directly controverts their claim that alien numbers are required to obtain infor-

mation from PCQS: "PCQS is also configured to retrieve information from certain IT connected systems based on the defined search criteria. Users can perform searches by *name (with Date of Birth)*, Name (with Country of Birth), A-Number, Receipt Number, ... SSN, ...., State Issued ID (Driver's License Number, State Permit ID, or State ID) ...." ECF No. 48-3 at 11.

### 2.   LESC / ACRIMe

Furthermore, PCQS is not the only method available to DHS for obtaining information about the immigration status of individuals. As the Supreme Court has pointed out, through 8 U.S.C. § 1373, "Congress has *obligated* ICE to respond to any request made by state officials for verification of a person's citizenship or immigration status," and one of the ways that DHS ensures compliance with Section 1373 is through "ICE's Law Enforcement Support Center," (LESC) which "operates 24 hours a day, seven days a week, 365 days a year and provides, among other things, immigration status, identity information and real-time assistance to local, state and federal law enforcement agencies." *Arizona v. United States*, 567 U.S. 387, 412 (2012) (emphasis added).

The LESC uses the "Alien Criminal Response Information Management System (ACRIMe)" to respond to Immigration Alien Queries (IAQs) from State and local agencies about the immigration status of individuals. *Privacy Impact Assessment for Alien Criminal Response Information Management System (ACRIMe)* (hereinafter "*ACRIMe PIA*"), U.S. Dep't of Homeland Security at 1, (Apr. 22. 2010), https://perma.cc/GVF7-2N6L. "The ACRIMe Operations Module uses personal identifiers *such as name and date of birth* from the IAQ to automatically search various criminal, customs, and *immigration databases* to gather information about the subject of the request." *Id.* at 4 (emphasis added). Multiple federal court decisions from around the country that describe procedures used by the LESC confirm that the LESC has the capability of looking up the immigration status of individuals *without* an alien number, and often using only an individual's name and date of birth. *E.g. United States v. Farias-Gonzalez*, 556 F.3d 1181, 1183 (11th Cir. 2009) (describing how an Immigration and Customs Enforcement (ICE) "agent ... testified that he had called a law enforcement support center to check the name and date of birth on the identification the man had given them"); *United States v.*

*Meza-Gonzalez*, No. 517CR008211OLG, 2018 WL 1792171, at *2 (W.D. Tex. Apr. 16, 2018) (describing how an ICE agent "called the Law Enforcement Support Center ('LESC') operated by the Department of Homeland Security (HSI)," which was able to obtain information about the individual's prior immigration history using the person's "name and date of birth"); *United States v. Vasquez-Ortiz*, No. 1:07-CR-348-CC-AJB, 2008 WL 11449053, at *5 (N.D. Ga. June 13, 2008), aff'd, 344 F. App'x 551 (11th Cir. 2009) (describing how an ICE agent working in conjunction with the FBI obtained a "defendant's name and date of birth" and then "checked the defendant's name with the Law Enforcement Support Center"); *see also Mendoza v. United States Immigr. & Customs Enf't*, 849 F.3d 408, 413–14 (8th Cir. 2017) (describing how a local jail booking agent called an ICE toll-free number and an ICE agent obtained an inmate's "name ... date of birth, parents' names, and social security number" and place of birth, with which the LESC "found two files that matched [the inmate's] information.")

Of course, it makes perfect sense that DHS would be able to search its own databases and find information about individuals without needing an alien number. How could our nation's immigration enforcement agency conduct basic operations under the absurd constraints that the Defendants wrongly attribute to it? DHS is a major federal law enforcement agency. How could it be that DHS would be powerless to look up information about any individual lacking an alien number? To accept the Defendants' fanciful claims would require this Court "to exhibit a naivete from which ordinary citizens are free." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019).

**C.     The information available through 1373/1644 Requests qualifies as a "database."**

The information access guaranteed by Sections 1373 and 1644 qualifies as a "database" under Arizona law. The relevant Arizona statutes that require the Defendants to search federal databases do not define the meaning of the term "database." A.R.S. § 16-121.01(D)(5); A.R.S. § 16-165(K). Neither do Arizona's election statutes more generally define the meaning of the term "database." Arizona law requires that terms not defined in statute be given their "commonly accepted meanings." *Planned Parenthood Arizona, Inc. v. Mayes*, 257 Ariz. 110, 115

¶ 16 (2024); *see also* A.R.S. § 1-213 ("Words and phrases shall be construed according to the common and approved use of the language.").

Black's Law Dictionary defines "database" as "[a] compilation of information arranged in a systematic way and offering a means of finding specific elements it contains, often today by electronic means." *Database*, Black's Law Dictionary (12th ed. 2024). Similarly, the American Heritage Dictionary defines "database" as "[a] collection of data arranged for ease and speed of search and retrieval." *Database*, American Heritage Dictionary, (5th ed.).

Sections 1373 and 1644 guarantee to State and local agencies receipt of "information regarding the immigration status, lawful or unlawful, of an alien in the United States." 8 U.S.C. § 1644; *see also* 8 U.S.C. 1373 (requiring DHS to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law.") By operation of federal statute, therefore, the county recorders have access to DHS's information about the immigration status of every registered voter. This information in DHS's possession is compiled, collected, and arranged.

This is obvious both in the abstract and in the practical application. The particular instantiations of how DHS organizes its information that are discussed in this brief, PCQS and ACRIMe, are routinely described by DHS and by courts as "databases."

There is thus no truth to the Defendants' claim that "PCQS is not a database." ECF No. 48 at 15-16. Multiple federal courts around the county, including the Ninth Circuit, have said precisely the opposite, characterizing it as a database. *See, e.g., Gonzalez v. United States Immigr. & Customs Enf't,* 975 F.3d 788, 821 (9th Cir. 2020) (including PCQS in list of "sixteen databases" relied on by ICE when determining whether to issue an immigration detainer); *Enriquez-Perdomo v. Newman,* 54 F.4th 855, 859 (6th Cir. 2022) (describing declaration submitted by ICE officer stating that "his office conducted searches in USCIS's... *Person Centric Query Service' (PCQS) database*[]" and that stated "he reviewed the CLAIMS, *PCQS*, and 'ENFORCE Alien Removal Module' (EARM) *databases*" (emphasis added)); *Treez, Inc. v. United States Dep't*

*of Homeland Sec.*, No. 22-CV-07027-RS (TSH), 2024 WL 4312233, at *4 (N.D. Cal. Sept. 26, 2024) (describing declaration submitted by DHS that "addresse[d] the databases Defendants can search and methodologies they can use to locate files related to ... petitions for nonimmigrant workers," and explaining that [t]hese *databases* and methodologies include ... *Person Centric Query System ("PCQS")*" (emphasis added)); *United States v. Perez*, No. 3:18-CR-30, 2021 WL 2019205, at *7 (W.D. Va. May 20, 2021) (describing testimony from ICE deportation officer about how "he had conducted searches on ... the *PCQS*, NCIC and NLETS *databases* (emphasis added)); *United States v. Meza-Gonzalez*, No. 17-CR-2552-GPC, 2018 WL 3752780, at *2 (S.D. Cal. Aug. 7, 2018) (describing process Border Patrol agents follow to obtain "immigration or criminal history" of detainees and explaining that "[d]uring this process several *databases* are checked, including the SDlaw criminal history database and *PCQS immigration databases.*" (emphasis added)); *Jud. Watch, Inc. v. United States Dep't of Homeland Sec.*, 59 F. Supp. 3d 184, 191 (D.D.C. 2014) (in FOIA lawsuit, describing declaration submitted by DHS stating that the agency search for responsive documents included "a variety of DHS computer *databases* that store records and data relating to the processing of immigration benefits and petitions, including ... the *Person Centric Query System (PCQS)*" (cleaned up) (emphasis added)); *United States v. Perez-Hernandez*, No. CR 18-3752 KG, 2019 WL 2176313, at *5 (D.N.M. May 20, 2019) (finding of fact that "USCIS maintains .... centralized computer *databases* includ[ing] ... *the Person Centric Query System ('PCQS')*" (emphasis added)).

The same holds true for ACRIMe. *See ACRIME PIA,* at 9 ("ACRIMe provides automated search capabilities of various government databases"); *United States v. Robles-Velasco*, No. 5:22-CR-00263-DSF, 2024 WL 3259569, at *1 (C.D. Cal. July 1, 2024) (explaining that "immigration authorities have access to various *databases*, including ... the *Alien Criminal Response Information Management System (ACRIMe)*" and describing how deportation officer had been "conducting a routine *database* check of the *ACRIMe*" (emphasis added)).

**D.    List maintenance that includes SAVE checks and not 1373/1644 Requests violates the NVRA's uniformity and nondiscrimination requirements.**

The NVRA requires that voter list maintenance must be "uniform [and] nondiscrim-inatory." 52 U.S.C. § 20507(b)(1). In their TRO/PI Brief, the plaintiffs argued that these requirements are violated when "voter-roll maintenance singles out one group of voters for different treatment." ECF No. 57 at 6. Maricopa County never disputes that this is the correct standard. It merely contends that "this Court already held that citizenship inquiries utilizing SAVE do not violate the NVRA's uniformity requirement." ECF No. 48 at 16 (citing *Mi Familia Vota v. Fontes*, --- F.Supp.3d ---, 2024 WL 862406, at *42-43 (D. Ariz. Feb. 29, 2024). However, this argument is a *non sequitur*. *Mi Familia* never made a blanket holding that SAVE checks are always and forever permissible under the NVRA, but only that SAVE checks passed muster under the facts as alleged in that case. The *Mi Familia* decision never considered whether SAVE checks might violate the NVRA's uniformity and nondiscrimination require-ments in light of the availability of 1373/1644 Requests.

Given that the Defendants concede (as they must) the NVRA is violated when voter-roll maintenance singles out one group of voters for different treatment, there is no plausible scenario in which the Defendants could get away with conducting SAVE checks on Federal-Only Voters who have provided an alien number (and who are, therefore, not natural born citizens) and not submitting 1373/1644 Requests for all other Federal-Only Voters (who are either natural-born citizens or unlawfully present aliens).

**VI.    The Plaintiffs will suffer irreparable harm.**

For the same reasons explained above in Section I about the harm the Plaintiffs will suffer for purposes of the standing analysis, the Plaintiffs will suffer irreparable harm absent relief from this Court.

**VII.    The balance of hardships favors the Plaintiffs.**

The requested relief will cause no harm to the Defendants—the only thing they will have to do is send letters to DHS and the Arizona Attorney General. However, the relief will alleviate significant hardship that the Plaintiffs are suffering because of the Defendants' fail-ures.

## VIII.   Proposed-Intervenor DNC's Eleventh and Fourteenth Amendment claims are inapplicable

Finally, Proposed-Intervenor Democratic National Committee ("DNC") suggests that because "four of [Plaintiffs'] five causes of action—and all of the relief [Plaintiffs] seek in their motion—are solely concerned with what Arizona law requires of Arizona officials[,]" the Eleventh Amendment prohibits federal courts from "'instruct[ing] state officials on how to conform their conduct to state law,' even when such claims are 'masked under federal law.'" ECF No. 46-3 at 11 (quoting *Bowyer v. Ducey*, 506 F.Supp. 3d 699, 716 (D. Ariz. 2020).

However, as noted in the DNC's Response, Eleventh Amendment immunity was waived by Maricopa County because it "invoke[d] federal judicial authority." *See Embury v. King*, 361 F. 3d 562, 566 (9th Cir. 2004). And despite the DNC raising this defense, *none* of the counties joined in the DNC's response. (*See* ECF Nos. 52 (Pinal), 53 (Yavapai), 54 (Navajo), 66 (Coconino), 67 (Pima), 69 (Apache), 71 (Yuma), 73 (Graham), 74 (Cochise), 77 (Greenlee), 80 (La Paz), 81 (Santa Cruz), 82 (Mohave), and 84 (Gila)). "[T]he decision to invoke sovereign immunity belongs to the state." *Jackson v. Abercrombie*, 884 F.Supp.2d 1065, 1082 (D. Hawaii, 2012) (citations omitted). Here, none of the Defendants have invoked the Eleventh Amendment, and the DNC, as Proposed-Intervenor, cannot force the counties to invoke sovereign immunity. *Id.*

Because the Eleventh Amendment cannot be invoked by the DNC and has not been invoked by any of the county Defendants, the arguments that the equal protection clause of the Fourteenth Amendment could or would be violated are inapplicable as all counties will be similarly bound by any order of this Court.

RESPECTFULLY SUBMITTED this 7th of October, 2024.

**America First Legal Foundation**

By: _/s/ James Rogers_

James K. Rogers (No. 027287)
*Senior Counsel*
America First Legal Foundation
611 Pennsylvania Ave., SE #231
Washington, D.C. 20003
Phone: (202) 964-3721
James.Rogers@aflegal.org

Jennifer J. Wright (027145)
Jennifer Wright Esq., Plc
4350 E. Indian School Rd
Suite #21-105
Phoenix, Arizona 85018
jen@jenwesq.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of October, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the District of Arizona using the CM/ECF filing and transmittal of a Notice of Electronic filing to the CM/ECF registrants on record.

_/s/ James K. Rogers_
*Attorney for the Plaintiffs*