Roy Herrera (#032901)
Daniel A. Arellano (#032304)
**HERRERA ARELLANO LLP**
1001 North Central Avenue, Suite 404
Phoenix, Arizona 85004
Telephone: 602.567.4820
roy@ha-firm.com
daniel@ha-firm.com

Alexis E. Danneman (#030478)
**PERKINS COIE LLP**
2525 East Camelback Road, Suite 500
Phoenix, Arizona 85016-4227
Telephone: 602.351.8000
ADanneman@perkinscoie.com
DocketPHX@perkinscoie.com

Jonathan P. Hawley (WA #56297)*
Heath L. Hyatt (WA #54141)*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: 206.359.8000
JHawley@perkinscoie.com
HHyatt@perkinscoie.com

*Attorneys for the Democratic National Committee*

*Admitted pro hac vice

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| STRONG COMMUNITIES FOUNDATION OF ARIZONA INCORPORATED et al.,<br><br>Plaintiffs,<br><br>v.<br><br>STEPHEN RICHER, in his official capacity as Maricopa County Recorder, et al.,<br><br>Defendants. | No. CV-24-02030-PHX-SMB<br><br>**DEMOCRATIC NATIONAL COMMITTEE'S REPLY IN SUPPORT OF MOTION TO INTERVENE** |

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................2

    I.    The DNC is entitled to intervention as of right. .......................................2

        A.    The DNC has significant interests that would be impaired by Plaintiffs' requested relief. ...............................................................2

        B.    The existing parties do not adequately represent the DNC's interests. ..........................................................................................7

    II.    Alternatively, the DNC should be granted permissive intervention. .........10

CONCLUSION ..................................................................................................11

# INTRODUCTION

As this Court has already observed, "seeking to require every county recorder in Arizona to perform 'voter list maintenance'" and thus "divert resources from preparing for the general election" would lead to administrative hardships and the sort of last-minute purge prohibited by the National Voter Registration Act ("NVRA"). Order 1–2, 20–22, ECF No. 90. Given that Plaintiffs' requested relief would place obstacles between the DNC's voters and the ballot box—and that Rule 24 is construed "broadly in favor of proposed intervenors" to "involv[e] as many apparently concerned persons as is compatible with efficiency and due process," *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011) (en banc) (cleaned up)—the DNC has a clear interest in this litigation and should be allowed to participate in these proceedings. That intervention is appropriate has been further confirmed by the DNC's distinct position and litigation strategy: While Defendants opted to answer Plaintiffs' amended complaint and only later moved for judgment on the pleadings, the DNC filed a proposed motion to dismiss with its intervention motion to dispose of Plaintiffs' claims as expeditiously as possible, thus demonstrating celerity that might not be shared by the existing parties.

In response to the DNC's intervention motion, Plaintiffs systematically mischaracterize the consequences of the relief they seek, the DNC's interests in this litigation, and the applicable legal standards. Most egregiously, Plaintiffs repeatedly insinuate that the DNC's interest in this litigation extends to allowing noncitizens to cast ballots. *This is false*. The DNC seeks only to ensure that U.S. citizens entitled to vote in Arizona are not mistakenly disenfranchised as a result of the kind of rushed, inevitably error-prone actions that Plaintiffs request. (Indeed, the NVRA's ninety-day cutoff exists in part because erroneous removals too close to elections cannot be timely fixed.) The DNC definitively has no interest in voting by noncitizens, and there is no reason to think that dismissal of Plaintiffs' amended complaint (or intervention by the DNC) will result

in noncitizen voting. State and federal laws make clear that the franchise is limited to U.S. citizens who otherwise satisfy the applicable voter-eligibility requirements. Plaintiffs' requested remedies, however, would unlawfully disenfranchise *eligible* voters—which is why the DNC now seeks to intervene and safeguard the right to vote of its supporters and constituents.

Plaintiffs' opposition falls flat. Once the consequences of their requested relief are properly understood, it becomes clear that this lawsuit would substantially impair the DNC's significant interests, which are not adequately represented by any existing party. The DNC has satisfied the requirements for intervention as of right and permissive intervention, and its motion should be granted.

## ARGUMENT

### I. The DNC is entitled to intervention as of right.

The DNC satisfies the requirements for intervention as of right: Its motion is timely, its interest in safeguarding the voting rights of its supporters would be impaired by Plaintiffs' requested relief, and Defendants cannot and will not adequately represent the DNC's partisan interests. Plaintiffs' arguments to the contrary are unavailing.

#### A. The DNC has significant interests that would be impaired by Plaintiffs' requested relief.

The DNC has met the minimal burden of showing that the "disposition of t[his] case may, as a practical matter, affect it." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 898 (9th Cir. 2011) (cleaned up). Plaintiffs have failed to meaningfully refute that the DNC has at least four cognizable interests affected by this litigation.

**Access to the franchise.** The DNC has an undeniable interest in ensuring that its supporters and members, at least some of whom would likely be wrongfully caught up in Plaintiffs' purge efforts or chilled from participating in the general election, can access

the ballot box without harassment, impediment, or erroneous removal. *See* DNC's Mot. to Intervene ("Mot.") 8–9, ECF No. 46. It is thus unsurprising that courts routinely recognize that political parties have interests sufficient for intervention in cases involving challenges to voting laws. *See, e.g.*, *Bost v. Ill. State Bd. of Elections*, 75 F.4th 682, 687 (7th Cir. 2023) (recognizing state party's "associational interest on behalf of its members" who might not be able to vote as result of ballot-receipt law); *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 306 (5th Cir. 2022) (sufficient interests for intervention include party committees' need to "expend significant resources" based on new election law that "regulates the conduct of the Committees' volunteers and poll watchers").

Here, Plaintiffs seek eleventh-hour "list maintenance" targeting tens of thousands of lawful federal-only voters. Although Plaintiffs take pains to describe their lawsuit in the most innocuous light possible, the DNC has explained that "[e]ven legitimate efforts to remove ineligible voters from the rolls are not free from error or abuse." Mot. 9. Plaintiffs fail to refute this point, arguing only that it was made "without any evidence or elaboration." Pls.' Opp'n to Mot. to Intervene of DNC ("Opp'n") 4, ECF No. 89. Not so: As the DNC noted in its intervention motion, the risks imposed by list-maintenance efforts—especially eleventh-hour attempts like Plaintiffs seek here—are ones Congress and the courts have recognized in the context of the NVRA's ninety-day cutoff. *See* Mot. 9 (citing S. Rep. No. 103-6, at 3 (1993); *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 179 (3d Cir. 2017)); *see also, e.g.*, *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014) (crediting argument that "the process of matching voters across various databases creates a foreseeable risk of false positives and mismatches based on user errors, problems with the data-matching process, flaws in the underlying databases, and similarities in names and birthdates"). Given that these legitimate concerns animate the DNC's interests in this litigation, Plaintiffs' apparent concession that eligible voters might be wrongly disenfranchised should end any debate about the DNC's interest to intervene.

*See, e.g.*, *Utah Ass'n of Cntys. v. Clinton*, 255 F.3d 1246, 1253 (10th Cir. 2001) ("[A] would-be intervenor must show only that impairment of its substantial legal interest is *possible* if intervention is denied. This burden is minimal.").

No more persuasive is Plaintiffs' claim that the DNC's concerns are "speculative" or "contingent." Opp'n 1. They suggest that the DNC is wrong to "imply" that "DHS's data . . . is unreliable," *id.* at 4, but *DHS itself* has acknowledged that the Person Centric Query Service ("PCQS") that Plaintiffs champion might "display inaccurate data due to inaccuracies in underlying source IT systems" because the "PCQS is not the original point of collection for the information" and instead "depend[s] on the accuracy of the connected IT system information." *Privacy Impact Assessment for the Person Centric Query Service*, DHS 7 (Mar. 8, 2016), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-pcqs-march2016.pdf. A DHS assessment cited by *Plaintiffs themselves* explains that, since the PCQS simply "provides a mechanism to view data that is collected and resides across multiple connected systems," it might "distribute[] erroneous data." *Privacy Impact Assessment Update for the USCIS Person Centric Query Service*, DHS 8 (June 8, 2011), https://www.dhs.gov/xlibrary/assets/privacy/privacy-pia-uscis-pcqssisv-esdvd.pdf; *see also* First Am. Compl. ("FAC") ¶ 128 n.77, ECF No. 12. The risks of inaccurate data matching—and the critical fact that "[e]ligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote," *Arcia*, 772 F.3d at 1342—establish that Plaintiffs' requested relief would impose nonspeculative hardships on eligible voters (and, by extension, the DNC).

Plaintiffs also raise the puzzling argument that, because the DNC previously questioned the reliability of DHS's Systematic Alien Verification for Entitlements ("SAVE") database in the *Mi Familia Vota* litigation, it should now be precluded from flagging the unreliability of the PCQS for purposes of intervention. Opp'n 4. Setting aside that *Plaintiffs* are the ones now rehashing that rejected argument, *see, e.g.*, FAC ¶ 89

(alleging that SAVE is "insufficient to definitively verify the citizenship of all Federal-Only Voters"), the reliability of the SAVE system is *not* a basis for the DNC's intervention motion. Plaintiffs cite no authority for their argument that the DNC's scrutiny of a *different* DHS database in *prior* litigation somehow forecloses the argument that the PCQS is also unreliable. Plaintiffs' issue-preclusion argument is both wrong and irrelevant.

**Diversion of resources.** Next, Plaintiffs utterly mischaracterize the DNC's interest in preventing the diversion of its limited resources as only intending "to help foreign citizens vote in Arizona's elections." Opp'n 4–5. That is obviously not the DNC's argument. Instead, if Plaintiffs succeed in this lawsuit, then the DNC would be required to redirect resources to at least two new endeavors: helping its members and supporters overcome *erroneous* citizenship determinations and countering the inevitable chill on political participation by lawful voters. *See Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 862406, at *22, *27, *30–31 (D. Ariz. Feb. 29, 2024) (crediting testimony that citizenship-confirmation and -investigation procedures "would deter Democratic supporters from registering to vote for fear of potentially subjecting themselves or a family member to scrutiny by law enforcement or prosecution" and concluding that DNC had direct and representational standing to challenge these laws). These harms—and the diversion of resources they would necessitate—exist for *lawful* Arizona voters. After all, there is a reason why the NVRA forecloses eleventh-hour purges of the sort that Plaintiffs seek here.

Plaintiffs also incorrectly claim that the DNC seeks to "manufacture [an] injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." Opp'n 5 (quoting *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)). But Plaintiffs ignore the uncontested evidence that the DNC submitted demonstrating the detrimental effect of Plaintiffs' requested relief on its core mission of electing Democratic

candidates. *See* Decl. of Jake Kenswil ("Kenswil Decl.") ¶ 14, ECF No. 46-2. As the Court noted in its recent analysis of Plaintiffs' standing (or lack thereof), an organization can establish a cognizable injury by "show[ing] that a challenged [] action directly injures the organization's pre-existing core activities and does so apart from [its] response to that governmental action." Order 16 (quoting *Ariz. All. for Retired Ams. v. Mayes*, No. 22-16490, 2024 WL 4246721, at *2 (9th Cir. Sept. 20, 2024)). Here, the DNC has demonstrated through uncontroverted evidence that Plaintiffs' voter-purge efforts would directly injure the DNC's core electoral activities—in turn requiring new expenditures to remedy. *See* Kenswil Decl. ¶ 14.

**Electoral prospects.** Relatedly, Plaintiffs' proposed relief would chill potential Democratic voters from registering in the first place *and* discourage already registered voters from casting ballots in the upcoming election, thus impairing the DNC's electoral prospects. *See* Mot. 11–12; *Mi Familia Vota*, 2024 WL 862406, at *22 (noting that citizenship-verification rules have effect of chilling political participation from targeted populations). Plaintiffs again argue that "[t]he DNC does not have a protectable interest in enhancing its electoral prospects through illegal voting," Opp'n 6, to which the DNC again responds that its intervention is based on the burdens Plaintiffs would impose on *eligible* voters, not noncitizens. On this point, Plaintiffs claim only that the DNC's supporters and members would feel no *additional* chill from the scrutiny and additional investigation this lawsuit seeks. *Id.* But Plaintiffs seek to impose *an entirely new* citizenship-verification regime because, from their perspective, the current procedures used by Arizona's election officials are "insufficient." FAC ¶ 89. As the DNC's uncontested declaration demonstrates, some Democratic voters would likely be chilled from participating in the political process because of the specific relief that Plaintiffs seek. *See* Mot. 11; Kenswil Decl. ¶¶ 10–11. DHS's own concession that the PCQS might display inaccurate data, coupled with Arizona's requirement to refer potential registration

cancellations to both "the county attorney and attorney general for possible investigation," A.R.S. § 16-165(A)(10), would magnify the chill on even *eligible* voters.

**Mi Familia Vota.** Finally, Plaintiffs argue that there is "nothing for [the DNC] to protect" related to the *Mi Familia Vota* litigation. Opp'n 6. This argument stems from a fundamental mischaracterization of the result of *Mi Familia Vota* that the DNC seeks to uphold here. That litigation reaffirmed the right of voters who submit the federal voter-registration application without providing DPOC to vote in federal elections. *See Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 2244338, at *1–3 (D. Ariz. May 2, 2024), *stayed in part on other grounds sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, No. 24A164, 2024 WL 3893996 (U.S. Aug. 22, 2024). Plaintiffs' lawsuit effectively seeks a workaround to that holding, requiring eligible federal-only voters to produce DPOC in response to novel citizenship-verification procedures. That workaround would undoubtedly "impair[]" the DNC's interest in maintaining the ability of lawful Arizona voters who have not provided DPOC to cast federal-only ballots. *Wilderness Soc'y*, 630 F.3d at 1179.

Moreover, the relief Plaintiffs seek here—novel citizenship verification for *every* federal-only voter under 8 U.S.C. §§ 1373 and 1644 because those voters have not provided DPOC—*was not litigated* in *Mi Familia Vota*. The DNC's opposition to Plaintiffs' requested relief is thus both consistent with and unaffected by its participation in the *Mi Familia Vota* litigation. Instead, it is *Plaintiffs* who are relitigating *Mi Familia Vota* by seeking a workaround to the ability of voters who have not provided DPOC to cast federal-only ballots. Far from barring the DNC's participation in this lawsuit, *Mi Familia Vota* provides another ground for intervention. *See* Mot. 12–13.

**B.  The existing parties do not adequately represent the DNC's interests.**

Next, the DNC has met its similarly "minimal" burden of showing inadequacy of representation because Defendants' representation of the DNC's "interests may be

inadequate." *Citizens for Balanced Use*, 647 F.3d at 898 (cleaned up). As the Ninth Circuit has noted, "[t]he most important factor in assessing the adequacy of representation is how the [putative intervenor's] interest compares with the interests of existing parties," *id.* (cleaned up), and here, neither Defendants nor anyone else in this litigation represents the DNC's partisan interests, let alone adequately.

In opposing intervention, Plaintiffs claim that the DNC has not overcome at least two presumptions of adequate representation. Opp'n 7–8; *see also Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003) (requiring heightened showing to rebut presumption of adequacy where (1) "the government is acting on behalf of a constituency that it represents" or (2) the applicant and existing party "have the same ultimate objective"), *as amended* (May 13, 2003). To start, as the DNC noted in its motion, *see* Mot. 14 n.6, *Berger v. North Carolina State Conference of NAACP* has cast significant doubt on the continued viability of these presumptions, as the U.S. Supreme Court held that "[w]here 'the absentee's interest is similar to, *but not identical with*, that of one of the parties,' that normally is not enough to trigger a presumption of adequate representation." 597 U.S. 179, 197 (2022) (emphasis added) (quoting 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1909 (3d ed. 2024)); *see also Callahan v. Brookdale Senior Living Cmtys., Inc.*, 42 F.4th 1013, 1021 n.5 (9th Cir. 2022) (noting that *Berger* "calls into question whether the application of [the ultimate-interests] presumption is appropriate").

In any event, even assuming either presumption applies, the DNC has rebutted it. The DNC would, for example, offer "necessary elements to the proceeding that other parties would neglect." *Arakaki*, 324 F.3d at 1086. The DNC alone possesses a parochial, campaign- and candidate-oriented interest that Defendants, bound to implement Arizona law free from partisan considerations, cannot provide. Indeed, a party committee's "private interests are different in kind from the public interests of" government officials

because a political group "represent[s] its members to achieve favorable outcomes" whereas "[n]either the State nor its officials can vindicate such an interest while acting in good faith." *La Union del Pueblo Entero*, 29 F.4th at 309. And although Plaintiffs suggest that Defendants' objective in this litigation "is the same objective as the DNC," Opp'n 9, they paint with too broad a brush; "[a]fter all, a prospective intervenor must intervene on one side of the 'v.' or the other and will have the same general goal as the party on that side," but that does not mean that Defendants are "interested in [the DNC's] financial expenditures, the execution of [the DNC's] mission, or the elements of [the DNC's] work that will suffer if resources are diverted elsewhere." *Bost*, 75 F.4th at 688–89 (noting that "while [political party] and [State defendant] each want the law upheld, the stakes for each of them are different").*

Further, it is not the case that the present parties "will undoubtedly make all of" the DNC's arguments. *Arakaki*, 324 F.3d at 1086. Plaintiffs argue that the DNC has not identified "any specific argument it will make that the Defendants will not also make." Opp'n 7. But "it is not [the DNC's] burden at this stage in the litigation to anticipate specific differences in trial strategy"; instead, "[i]t is sufficient for [the DNC] to show that, because of the difference in interests, it is *likely* that Defendants will not advance the same arguments." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 824 (9th Cir. 2001) (emphasis added); *see also Citizens for Balanced Use*, 647 F.3d at 901 (relevant inquiry is whether interests are so similar between existing parties and aspiring intervenors that former would "undoubtedly make all of" latter's arguments). At any rate, the record in this case demonstrates the divergent nature of the DNC's arguments and approach. In addition to opposing Plaintiffs' motion for preliminary relief, the DNC filed a proposed

---

* Underscoring the unpredictability of this litigation and the DNC's inability to rely on Defendants' representation, at least one Defendant county *did not oppose* Plaintiffs' call for immediate relief. *See* ECF No. 77.

motion to dismiss Plaintiffs' claims in their entirety. *See* ECF No. 46-3. Defendants, by contrast, initially answered Plaintiffs' complaint and only later moved for dispositive relief. *See La Union del Pueblo Entero*, 29 F.4th at 308 (allowing intervention where defendants' and proposed intervenors' "interests diverge first and foremost with how to carry out the ultimate objective").

Plaintiffs suggest that the DNC cannot overcome a presumption of adequate representation without showing that "the [government's] representation is negligent or undertaken in bad faith." Opp'n 8 (alteration in original) (quoting *One Wis. Inst., Inc. v. Nichol*, 310 F.R.D. 394, 399 (W.D. Wis. 2015)). No such showing is required in the Ninth Circuit. And even in the Seventh Circuit, a showing of negligence or bad faith is necessary to overcome the presumption only where the governmental defendant is legally charged with protecting the interests of the proposed intervenors. *See Bost*, 75 F.4th at 688. But the Seventh Circuit has recognized that state election administrators are *not* legally required to represent the interests of political parties. *Id.* So too here: Defendants are county election officials and, notwithstanding their governmental affiliations, do not (and cannot) represent the DNC's partisan interests. Accordingly, the heightened showing of negligence or bad faith that Plaintiffs describe does not apply.

## II. Alternatively, the DNC should be granted permissive intervention.

Plaintiffs do not dispute that the DNC has satisfied the requirements for permissive intervention. *See* Opp'n 9–10. Nor could they. Plaintiffs themselves acknowledge that the DNC's motion is timely, *see id.* at 3; the DNC raises common questions of law and fact, *see* Mot. 16; and the DNC will proceed in accordance with any schedule set by the Court. Indeed, the DNC filed its proposed opposition to Plaintiffs' request for preliminary relief along with its motion to intervene—and before any Defendant opposed Plaintiffs' motion.

Instead of addressing the requirements for permissive intervention, Plaintiffs rehash their unpersuasive claim that the DNC has somehow "made clear its intent to

relitigate its claims from *Mi Familia Vota*," which "will unduly delay these proceedings and prejudice the adjudication of the Plaintiffs' claims." Opp'n 9–10. As explained above, however, Plaintiffs' arguments related to *Mi Familia Vota* miss the point. *See supra* at 4–5, 7. And there is certainly no indication that the DNC's participation in this case will slow these proceedings or otherwise prejudice Plaintiffs or anyone else.

Lastly, Plaintiffs' suggestion that the Court allow the DNC only amicus participation, *see* Opp'n 10–11, would not be sufficient here. This is evidenced by the fact that the DNC moved to dismiss Plaintiffs' claims before any Defendant sought dispositive relief, thus signaling both divergent strategies and a need for the DNC to actively participate in this litigation that would not be facilitated by amicus participation.

## CONCLUSION

For these reasons, the DNC respectfully requests that the Court grant it intervention as of right or, alternatively, permissive intervention.

| | | |
|---|---|---|
| 1 | Dated: October 17, 2024 | **HERRERA ARELLANO LLP** |
| 2 | | Roy Herrera |
| | | Daniel A. Arellano |
| 3 | | 1001 North Central Avenue, Suite 404 |
| | | Phoenix, Arizona 85004 |
| 4 | | |
| | | **PERKINS COIE LLP** |
| 5 | | |
| | | By: */s/ Alexis E. Danneman* |
| 6 | | Alexis E. Danneman |
| | | 2525 East Camelback Road, Suite 500 |
| 7 | | Phoenix, Arizona 85016-4227 |
| 8 | | Jonathan P. Hawley* |
| | | Heath L. Hyatt* |
| 9 | | 1201 Third Avenue, Suite 4900 |
| | | Seattle, Washington 98101-3099 |

*Attorneys for the Democratic National Committee*

*Admitted pro hac vice

**CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2024, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

/s/ Indy LaFever